## ZURICH INSURANCE COMPANY *v.* FRIEDLANDER ET UX.

[No. 337, September Term, 1970.]

\* \* \*

## MARYLAND CASUALTY COMPANY *v.* FRIEDLANDER ET UX.

[No. 422, September Term, 1970.]

*Decided May 4, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*William A. Ehrmantraut,* with whom were *Donahue, Ehrmantraut & Gleason* on the brief, for Zurich Insurance Company. *John Edward Powell,* with whom were *McInerney, Layne & McCormick* on the brief, for Maryland Casualty Company.

*Edward H. Kerman* for appellees.

HAMMOND, C. J., delivered the opinion of the Court.

Jack L. Friedlander, an active practicing lawyer, a former active accountant, and an investor with a net worth of several million dollars, sued Zurich Insurance Company, which had issued to him and his wife a so-called Homeowners Policy that carried a "Credit Card and Depositors Forgery Coverage Endorsement," under which the company agreed to indemnify the insureds up to $10,-000 for loss resulting from the forgery of a check or checks, claiming that during the period the policy was in force he had lost over $10,000 by virtue of checks drawn on his personal account which his private secretary forged and cashed. The company defended primarily on the ground that the coverage provided by the endorsement was limited by an exclusionary clause that reads:

> "This endorsement does not apply to any loss arising out of the issuance of any checks, the acceptance of any counterfeit money or the misappropriation of any credit card in the course of the prosecution of the business, occupational or

> commercial pursuits of the Insured (unless
> issued or registered in his name and unless he
> is ˉpersonally libel thereon or therefor) or to
> loss caused by dishonesty of any Insured,"

and that the bank account on which the forged checks were drawn was not only a personal account but also was used by Friedlander for the deposit of income from investments, including joint ventures in real properties, and for the drawing of checks for new investments, and therefore the losses sued for arose, in the words of the exclusionary clause, out of the issuance of checks "in the course of the prosecution of the business, occupational or commercial pursuits of the Insured."

Judge Pugh, sitting without a jury, held that the bank account was a personal checking account, and the fact that on occasion checks were received from and drawn to pay for investments did not make the account one maintained as part of a business, occupational or commercial pursuit, and gave judgment for Friedlander against Zurich for $10,000.

The Zurich policy was succeeded by a policy of Maryland Casualty Company that contained identical ˉforgery coverage and an identical exclusionary clause. Friedlander sued Maryland Casualty for the losses that had occurred during the period its policy was in force and the case went to trial before Judge Levine and a jury. At the conclusion of the plaintiffs' case, Maryland Casualty elected not to offer testimony and Judge Levine, noting that there was no dispute of material fact, held as a matter of law that the exclusionary clause did not exonerate the insurer and directed a verdict for Friedlander.

Each insurance company appealed and the appeals were consolidated in this Court and argued together. We find that both cases were rightly decided below and will affirm the respective judgments.

The pertinent facts are few and simple. Friedlander is a senior partner in a Washington law firm. In early 1965 the firm employed a young lady who became Friedlan-

der's personal secretary. She was paid by the firm but she worked almost exclusively for Friedlander. She took over his personal check book and drew all checks on his personal bank account and presented them to him for signature since he alone could sign checks on the account. The firm had various bank accounts, all of which were audited by accountants. The personal account was not audited. Legal fees went into a firm account. Much of Friedlander's "draw" from the firm of $500 a week and the income and principal repayments from his investments went into his personal account. From that account all his personal and family bills were paid, including the chauffeur's pay, his mother's bills in a nursing home, and many of his household expenses. From time to time checks were drawn on the personal account to pay for investments in corporate stock or real estate ventures. Friedlander leaned heavily to investments in improved real estate because of their tax advantages, under which he enjoyed a heavy cash flow which did not currently become subject to income taxes because the depreciation on the real estate could be deducted.

Soon after her employment, Friedlander's secretary began to forge checks on the personal account. She would draw a check from the back of the check book to her own order, sign Friedlander's name, endorse it for deposit and put it in her own bank account. Over the years from 1965 to 1969 she stole some $42,000 in this way. When the statement came from the bank she would destroy the forged cancelled checks and their stubs and make the entries in the check book reflect the amount actually in the bank. When Friedlander from time to time asked what his balance was, she would give him the balance shown in the check book. Only because the balance she gave him one day seemed low to him did he look at the check books and the genuine cancelled checks and discover the scheme and the losses.

The insurers do not now question that $42,000 was stolen by forgeries or that the forgery endorsement makes them liable if they are not saved by the exclusionary clause.

They make two preliminary efforts to avoid liability: first, that Friedlander and his wife were the insureds and therefore any loss must have been joint to be recoverable; and second, that the loss occurred outside the home and therefore is not covered by a Homeowners Policy. To note these tentative and feeble left jabs is to know immediately how weak and ineffective they are.

The cases turned, as we see it, on whether the checks which occasioned the loss were drawn in the prosecution of the business, occupational or commercial pursuit of Friedlander and it is plain to us that they were not. The broad definition of "business" is that adopted by the Supreme Court in *Flint v. Stone Tracy Co.*, 220 U. S. 107, 171, as "That which occupies the time, attention and labor of men for the purpose of a livelihood or profit." Under this broad concept, obviously one who devoted enough time and attention to buy a hundred shares of stock, looking for a profit, could be said to be in the business of investing.

However, this broad meaning of the word business is not the meaning the word ordinarily and customarily conveys. The ordinary and customary meaning is that reflected in Webster's Third New International Dictionary as "commercial or mercantile activity customarily engaged in as a means of livelihood" or two definitions given by Funk and Wagnall's New Standard Dictionary of the English Language:

> "1. A pursuit or occupation that employs or requires energy, time or thought; trade, profession, calling.
> 2. Any occupation connected with the operations and details of trade or industry,"

or, one given by Black's Law Dictionary (3rd ed.): " 'Business' is often synonymous with calling, occupation or trade."

That the policies contemplated that their concepts of the meaning of "business" were those of the dictionary definitions we have set out is indicated by their explicit

definition of the word. Definition 2 (d) of the General Conditions is "Business: includes trade, profession or occupation." The indication is strengthened by the fact that the business exclusionary clause reinstates the insurer's liability if the forged check is issued in the insured's name and "he is personally liable thereon or therefor."

The Funk and Wagnall's definition of business as "any occupation connected with the operations and details of trade or industry" has been used by various courts as a test of whether one was or was not engaged in a business. The holdings are that the mere ownership of and the receipt of rent from improved real estate do not cause the owner and recipient to be engaged in business but, if he actively manages or operates, or participates in the management or operation of the property, he may be. See *Cross v. Leuenberger* (Wisc.), 65 N.W.2d 35, 37-38; *Bott v. Commonwealth* (Va.), 48 S.E.2d 235; *Arizona State Tax Com'n v. First Bank Building Corp.* (Ariz.), 429 P. 2d 481, 488; *Jackson v. Cathcart & Maxfield* (Minn.), 277 N. W. 22, 27; *Clausen v. Dinnebeil* (N. J.), 15 A. 2d 205, 206. As to investments in stocks, see *Wallace v. United States* (W.D.N.Y.), 50 F. Supp. 178, 180, and compare *Gen. Inv. Funds v. Gildenhorn,* 260 Md. 170, 179.

Friedlander himself made the distinction. In one or more of his real estate ventures, he actively participated in management or operation. In such case there was a separate bank account for operations and the account was audited. In the other real estate investments Friedlander merely received income and repayments of principal from those who managed or operated the property, and these receipts went into the personal account.

We are fully persuaded that the checks that occasioned Friedlander's losses were not issued "in the prosecution of the business, occupational or commercial pursuits of the Insured."

*Judgments affirmed, with costs.*