David Springer v. Erie Insurance Exchange, No. 79, Sept. Term 2013, Opinion by Battaglia, J.

**INSURANCE – POLICY INTERPRETATION – EXCLUSIONS – "BUSINESS PURSUITS"**

To determine if a third party complaint triggers the "business pursuits" exclusion in a homeowner's liability insurance policy, an insurer must consider the continuity of the insured's alleged business interests and the insured's profit motive.

Circuit Court for Frederick County, Maryland
Civil No. 10-C-12-001638
Argued: April 4, 2014


IN THE COURT OF APPEALS OF
MARYLAND


No. 79

September Term, 2013


DAVID SPRINGER

v.

ERIE INSURANCE EXCHANGE


Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.


Opinion by Battaglia, J.


Filed: June 24, 2014

This appeal arises out of an action filed in the Circuit Court for Frederick County by David Springer, Appellant, against Erie Insurance Exchange, Appellee ("Erie"), in which Mr. Springer sought declaratory relief and damages for breach of contract, after Erie refused to provide him with a legal defense when he was sued by a third party, J.G. Wentworth Originations, LLC ("J.G. Wentworth"), for, *inter alia*, defamation and false light.[1]  Mr. Springer claimed that, under the personal injury liability coverage provisions of his Erie homeowner's insurance policy, Erie had a duty to provide him with a legal defense in the J.G. Wentworth lawsuit.  Erie refused and filed a counterclaim for declaratory relief on its own behalf, arguing that the J.G. Wentworth lawsuit was triggered by Mr. Springer's business interests and that his insurance policy included a "business pursuits" exclusion, which specifically barred claims based on the insured's business pursuits.

After the Circuit Court heard oral arguments on cross motions for summary judgment, it issued a declaratory judgment and summary judgment in favor of Erie, declaring, in part, that "Erie Insurance Exchange did not have a duty to defend or indemnify David Springer" and that Erie was not obligated "to pay for the costs of that

---

[1] Also commonly known as invasion of privacy by false light, the centerpiece of this tort is an allegation that views have been attributed to an individual which placed him or her "before the public in a highly offensive and untrue manner."  *Black's Law Dictionary* 678 (9th ed. 2009).  This Court has previously stated that, "[a]n allegation of false light must meet the same legal standards as an allegation of defamation." *Piscatelli v. Smith*, 424 Md. 294, 306, 35 A.3d 1140, 1147 (2012); *see also Harnish v. Herald-Mail Co. Inc.*, 264 Md. 326, 337, 286 A.2d 146, 152 (1972); *Phillips v. Wash. Magazine, Inc.,* 58 Md. App. 30, 36 n. 1, 472 A.2d 98, 101 n. 1 (1984).

defense or this action." Mr. Springer noted an appeal to the Court of Special Appeals, and before the intermediate appellate court could decide the case, we issued a writ of certiorari on our own initiative, 433 Md. 513, 72 A.3d 172, to consider whether an insurer can rely solely on allegations contained within a complaint filed by a third party when denying an insured's claim for coverage under the insurance policy's "business pursuits" exclusion.[2]

We shall hold that in order to determine if a third party complaint triggers the "business

---

[2] When the Court of Appeals issues a writ of certiorari on its own initiative, and thereby "bypasses" the Court of Special Appeals, we generally rely on the questions presented in the Appellant's brief in the intermediate appellate court to frame the issues to be considered in this Court. *Dual Inc. v. Lockheed Martin Corp.*, 383 Md. 151, 161 n. 3, 857 A.2d 1095, 1100 n. 3 (2004). In the present case, those questions include:

> 1.Can the "business pursuits" exclusion in an insurance policy relieve an insurer of its duty to provide a defense to its insured, when the claims alleged were not connected to the insured's alleged business pursuits, and when the evidence about the insured's business activity demonstrated that the insured had not engaged in such activity for approximately two years?
>
> 2.Can the "expected or intended" exclusion in an insurance policy relieve an insurer of its duty to provide a defense to its insured, when the claims against the insured are based on reckless conduct and not solely intentional conduct?

In its opinion and order, the Circuit Court did not extensively address the "expected or intended" exclusion referred to by the parties in the questions presented, but rather awarded summary judgment solely on the basis of the "business pursuits" exclusion. As such, our review focuses on the "business pursuits" exclusion because, as stated on numerous occasions, we review "'only the grounds upon which the trial court relied in granting summary judgment.'" *Gourdine v. Crews*, 405 Md. 722, 736, 955 A.2d 769, 778 (2008), quoting *Rodriguez v. Clarke*, 400 Md. 39, 70, 926 A.2d 736, 754-55 (2007), quoting in turn *Standard Fire Ins. Co. v. Berrett*, 395 Md. 439, 451, 910 A.2d 1072, 1079 (2006); *Eid v. Duke*, 373 Md. 2, 10, 816 A.2d 844, 849 (2003), quoting *Lovelace v. Anderson*, 366 Md. 690, 695, 785 A.2d 726, 729 (2001). Therefore, we will not address the second issue presented.

pursuits" exclusion in a homeowner's liability insurance policy, an insurer must consider the continuity of the insured's alleged business interests and the insured's profit motive.

J.G. Wentworth brought suit in 2011 against David Springer and the Sovereign Funding Group in the Circuit Court for Frederick County, alleging that they had used two websites, jgw-sucks.com and jgwentworth-scam.com, to spread defamatory and false light information in an attempt to lure customers away from J.G. Wentworth. Mr. Springer then contacted Erie, his insurer, for the first time to request that Erie provide him with a legal defense in the J.G. Wentworth action, because he asserted that, under the terms of his "Ultracover HomeProtector" insurance policy, Erie had a duty to defend him.[3] When Erie refused to provide him with a defense, stating that his claim was precluded by, *inter alia,* the "business pursuits" exclusion in his policy, Mr. Springer retained his own lawyer, thereafter instituting this suit against Erie, in which he sought a declaratory judgment that Erie was obligated to defend him and that Erie had breached its duty by failing to do so.

In his complaint against Erie, Mr. Springer cited numerous provisions of his "Ultracover HomeProtector" insurance policy issued by Erie, effective in July 2009 and renewed annually thereafter. Section II of the policy described the "Home and Family Liability Protection" offered under the policy and explained that "Personal Liability Coverage includes Bodily Injury Liability Coverage, Property Damage Liability Coverage

---

[3] Mr. Springer's complaint against Erie states that he first tendered his claim for coverage to Erie on or about November 29, 2011, and subsequently re-sent his claim on December 8, 2011. Appended to Mr. Springer's complaint is a letter from Erie dated January 13, 2012, denying Mr. Springer's claim for coverage.

and Personal Injury Liability Coverage."   "Personal injury" was defined as:

**"personal injury"** means injury arising out of:

1. libel, slander or defamation of character;
2. false arrest, wrongful detention or imprisonment, malicious prosecution, racial or religious discrimination, wrongful entry or eviction, invasion of privacy, or humiliation caused by any of these.

The policy also contained the following assurance:

**PERSONAL INJURY LIABILITY COVERAGE**

OUR PROMISE

We will pay all sums up to the amount shown on the **Declarations** which **anyone we protect** becomes legally obligated to pay as damages because of **personal injury** caused by an offense committed during the policy period. **We** will pay for only **personal injury** covered by this policy.

We may investigate or settle any claim or suit for damages against **anyone we protect**, at **our** expense.  If **anyone we protect** is sued for damages because of **personal injury** covered by this policy, we will provide a defense with a lawyer **we** choose, even if the allegations are not true.  We are not obligated to pay any claim or judgment or defend any suit if we have already used up the amount of insurance by paying a judgment or settlement.

Erie defended against Mr. Springer's action, and as its own basis for declaratory relief, argued that Mr. Springer's claim for coverage was precluded by the policy's exclusions, which were detailed in a section of the policy entitled, "What We Do Not Cover--Exclusions."   Specifically, the "business pursuits" exclusion provided:

**We** do not cover under … Personal Injury Liability Coverage . . . :

2. …**personal injury** arising out of **business** pursuits of

4

**anyone we protect**.[4]

The policy defined "business" as "any full-time, part-time or occasional activity engaged in as a trade, profession or occupation, including farming."

In its counterclaim, Erie also cited another portion of its policy Erie asserted precluded Mr. Springer's claim:

> 19.     The policy further excludes from the **Personal Injury Liability Coverage** "**Bodily injury or personal injury** arising out of **business** pursuits of **anyone we protect**, other than **business** pursuits covered by this policy.
> * * *
> 21.     The policy further excludes from the **Personal Injury Liability Coverage** "Suits for libel, slander or defamation of character made against **anyone we protect** if the publication or statement" a. took place before the effective date of this

---

[4] The "business pursuits" exclusion also included a non-business exception which allowed coverage for injuries arising from a business pursuit if the insured's activity qualified as ordinarily incident to non-business.   Specifically, that exception stated:

We do cover:
a. activities normally considered non-**business**;
b. **business** pursuits of salespersons, collectors, messengers, and clerical office workers employed by others. **We** do not cover installation, demonstration and servicing operations;
c. **business** pursuits of educators while employed by others as educators, including corporal punishment of pupils;
d. occasional **business** activities of **anyone we protect**. These include, but are not limited to, babysitting, caddying, lawn care, newspaper delivery and other similar activities.

**We** do not cover regular **business** activities or **business** activities for which a person is required to be licensed by the state.
e. the ownership of newly-acquired one or two family dwellings, but only for a period of 30 consecutive days after acquisition unless described on the **Declarations.**

5

insurance or; b. was knowingly untrue."

The basis for Mr. Springer's claim, and Erie's claim of exclusion, was the action brought against Mr. Springer by J.G. Wentworth. J.G. Wentworth, a business specializing in purchasing structured settlements and annuities from individuals, sued Mr. Springer and Sovereign Funding Group, a company allegedly specializing in purchasing structured settlements and annuities, in the Circuit Court for Frederick County, alleging that Mr. Springer and the Sovereign Funding Group had engaged in false and misleading advertising in violation of Section 1125 of Title 15 of the United States Code, entitled the "Lanham Act," unfair and deceptive trade practices under Section 13-303 of the Commercial Law Article, Maryland Code (1975, 2013 Repl. Vol.) entitled "Practices generally prohibited" under the Maryland Consumer Protection Act, defamation *per se*, injurious falsehood,[5] false light, tortious interference with prospective business advantage, and tortious interference with contractual relations.

Specifically, J.G. Wentworth alleged in the complaint that Mr. Springer and the Sovereign Funding Group had created, maintained, and publicized two websites that disseminated false and defamatory information regarding J.G. Wentworth, specifically that

---

[5] Injurious falsehood, otherwise known as disparagement, is a "false and injurious statement that discredits or detracts from the reputation of another's character, property, product, or business." Black's Law Dictionary 538 (9th ed. 2009). *See Rite Aid Corp. v. Lake Shore Investors*, 298 Md. 611, 617, 471 A.2d 735, 738 (1984) ("It is firmly established that . . . injurious falsehood (sometimes known as disparagement or slander of title) . . . [is an] actionable tort[].").

Mr. Springer and the Sovereign Funding Group had sought, through the websites, "to mislead and misrepresent facts to the public, unfairly and deceptively compete, defame, disparage, and tortuously interfere with the business interests of J.G. Wentworth." The scheme was defined as follows:

2. Upon information and belief, Defendants intentionally and maliciously use or used the websites jgw-sucks.com ("jgw-sucks site") and jgwentworth-scam.com ("jgw-scam site") to deliver web content to J.G. Wentworth's customers and potential customers that Defendants know contains false and misleading statements about J.G. Wentworth. The Defendants also intentionally and maliciously link J.G. Wentworth's name with the word "scam" in a large number of bogus Internet articles for the sole purpose of creating a false belief on the part of customers and potential customers that J.G. Wentworth's business is a "scam" when Defendants know that J.G. Wentworth is, in fact, a legitimate business and not a scam. Defendants personally instructed, and continue to instruct, a large number of potential customers, through direct telephone communication, to visit the jgw-scam site and the jgw-sucks site, while misrepresenting to the potential customers that these are independent sites not controlled by the Defendants. Defendants, in fact, control these sites.

3. Defendants, through their scheme, attempted to conceal their role and avoid attribution by using Internet practices designed to keep their true identities, and tortious, anti-competitive purpose, hidden from potential customers. The Defendants intended to thereby endow their untrue, defamatory, and anti-competitive statements with a false aura of credibility. The Defendants know that if they claimed authorship of the jgw-sucks site, the jgw-scam-site, and the larger number of feeder sites and bogus articles containing reference to "jgwentworth" and "scam," then potential customers would have given these materials the credence they deserved: none. Defendants' unlawful conduct is ongoing and continuing.

4. Defendants, through direct, personal contact with potential customers, use these websites, domains, and bogus articles to distribute negative content about J.G. Wentworth to actual and potential customers, as well as to the public at large, in order to purposefully and dramatically

7

damage J.G. Wentworth's online brand and business reputation and discourage customers from doing business with J.G. Wentworth. Defendants engage in this conduct know that their conduct is misleading, unfair, and unlawful.

Although the complaint contained numerous counts and factual allegations, the two counts, "defamation *per se"* and "false light," with which we are concerned, contained the following:

93. Defendants published false and defamatory statements concerning J.G. Wentworth on websites that they operated, including the jgw-scam site, the jgw-sucks site, and the scam-related sites.

94. The statements published by Defendants portray J.G. Wentworth in a negative light and discourage potential customers from doing business with J.G. Wentworth.

95. Among other false and defamatory statements, Defendants published statements accusing J.G. Wentworth of being "guilty" of criminal conduct, "fraud, misrepresentation and practices that were oppressive and unconscionable," "deceptive marketing practices," being liars, and that the company is a "scam."

96. The statements published by Defendants concerning J.G. Wentworth are defamatory *per se* because the statements falsely accuse J.G. Wentworth of criminal conduct, of immorality, and tend to injure J.G. Wentworth's profession or trade.

97. Defendants published the statements with actual malice, *i.e.* with knowledge of their falsity and/or reckless disregard for the truth and with the intention to gain an unfair business advantage.

98. Despite multiple demands to cease and desist operation of the websites by Defendants and remove the false and defamatory statements, Defendants refuse to remove the false statements from their websites.

99. As a direct result of Defendants' false and defamatory publications, J.G. Wentworth has suffered and continues to suffer actual

8

business losses as well as irreparable injury to its reputation, good will, and business interests.

Many similar allegations were made in the complaint regarding the second claim at issue, "false light":

111.   Defendants published false statements about J.G. Wentworth on the jgw-scam site, the jgw-sucks site, and the scam-related domains.

112.   The statements published by Defendants portray J.G. Wentworth in a negative light and discourage potential customers from doing business with J.G. Wentworth.

113.   Defendants published the statements with actual malice, *i.e.*, with knowledge of their falsity and/or reckless disregard for the truth.

114.   Despite multiple demands to cease and desist operation of the websites by Defendants and to remove the false statements which portray J.G. Wentworth in a negative light, Defendants refused to do so.

115.   J.G. Wentworth has suffered and continues to suffer actual harm to its reputation and business interests as a direct result of Defendants' conduct.

The J.G. Wentworth complaint is terse regarding Mr. Springer's involvement with the structured settlement business as he was sued individually, and the Sovereign Funding Group was sued as a corporation.[6]   J.G. Wentworth, however, did allege that Mr. Springer "is the CEO of Sovereign Funding Group and is associated with other entities or associations in the business of buying structured settlement payment streams" and that Mr. Springer and the Sovereign Funding Group benefitted from business lost by J.G.

---

[6] J.G. Wentworth's complaint did not mention how the Sovereign Funding Group is incorporated, but rather simply states that it "is a Maryland corporation doing business in Maryland and other states."

Wentworth, because of the alleged defamation. The viability of Sovereign as an entity, however, was questioned in the first footnote in the J.G. Wentworth complaint:

> The Maryland State Department of Assessments and Taxation ("SDAT") online Business Records Search did not result in any matches for a business entity call "Sovereign Funding Group." The SDAT Business Records Search did result in a record for the "Sovereign Group," which was registered at an address in Columbia, Maryland to Melissa Springer, who, upon information and belief, is the wife of Defendant David Springer. According to SDAT, the corporate status for the Sovereign Group was forfeited in April 2009. . . .

Eventually, however, pursuant to a joint stipulation between Mr. Springer and J.G. Wentworth, the case was dismissed with prejudice.

After the J.G. Wentworth litigation had been dismissed, Mr. Springer again contacted Erie in an attempt to recover the funds that he had expended in defending himself. When Erie refused to pay, Mr. Springer brought the instant action.

Appended to Mr. Springer's complaint is a letter from his attorney responding to Erie's earlier denial of his claim for legal coverage and informing Erie of the outcome of J.G. Wentworth litigation. The letter also sought reimbursement of Mr. Springer's legal costs:

> At the outset, I am happy to advise that this [J.G. Wentworth] matter has been successfully resolved. With a modest amount of attorney time and expense, we successfully defended against the preliminary injunction and raised such significant legal impediments to the plaintiff's claim that, following a conference with the court, an agreement was reached by which the plaintiff took a voluntary dismissal with prejudice. The matter is fully resolved, except of course for recovering the defense costs and expenses from Erie.

10

(footnote omitted).

Also appended to the complaint is a letter in which Erie had denied coverage under Mr. Springer's homeowner's policy and indicated that it had "reviewed all policy periods from inception forward in consideration of coverage" and that it had "determined the policy does not provide coverage for defense or indemnification of any potential judgment." The letter from Erie also duplicated portions of the policy related to personal injury liability exclusions and stated:

> The cited exclusions serve to preclude coverage for this matter. Erie Insurance will not make a defense referral. The policy does not provide coverage for defense or indemnification of any potential judgment. Again, this letter is written to serve as a full denial of coverage.

The letter concluded that it was "not meant to be exhaustive" and that Erie reserved the right "to deny coverage under any of the terms conditions or exclusions set forth in its policies." Mr. Springer, thereafter, filed suit in the Circuit Court for Frederick County seeking declaratory relief, which Erie also sought in a counterclaim, as well as $70,337 to compensate him for legal fees expended and $3,920.07 in costs incurred.

Both Mr. Springer and Erie filed motions for summary judgment in the Circuit Court. After hearing argument, the court granted summary judgment in favor of Erie and entered a declaratory judgment which stated:

> 1. That the allegations in the underlying suit filed against David Springer . . . were not potentially covered under the terms and conditions of the insurance policy . . . .
> 2. That the Underlying Action alleged wrongful acts that were expected or intended by David Springer and that arose out of the business

11

pursuits of David Springer (as business is defined by the policy cited herein); and

   3. That Erie Insurance Exchange did not have a duty to defend or indemnify David Springer in the Underlying Action, or to pay for the costs of that defense or this action.

On the same day, the Circuit Court issued an opinion and order explaining, in part, the rationale underlying the declaratory judgment and the granting of summary judgment in favor of Erie. The judge explained that, "It is quite clear from the underlying Complaint . . . that the allegations involved arose from the business pursuits of Mr. Springer" and that:

> Each of the allegations against Mr. Springer in the underlying case are derived from his position as a business competitor with Mr. Wentworth. It is asserted in the underlying complaint that the purpose of Mr. Springer's actions . . . was to gain a business advantage over Mr. Wentworth by dissuading customers from choosing Wentworth Originations, LLC.

Citing *Northern Assurance Co. of America v. EDP Floors, Inc.,* 311 Md. 217, 230, 533 A.2d 682, 688 (1987), the court explained that, pursuant to the policy's definition of "business," it was established "very clearly" that the J.G. Wentworth litigation "arose from [Mr. Springer's] "business pursuits" and noted that:

> There is no requirement that Plaintiff be currently engaged in such business, but rather that the action, "arose out of" Plaintiff's business pursuits. *See Northern Assurance Co. of America*, 311 Md. at 230. Therefore, because [] Springer's conduct, as alleged by Wentworth, originated from Springer's motive to gain an unfair business advantage/profits, the very description of Springer's actions fit neatly into the definition of business as it was done, "for the purpose of a livelihood or profit." *Zurich Insurance Co.*, 261 Md. at 616.

Because the Circuit Court determined that Mr. Springer's claim was "excluded for

12

coverage under the business pursuits provision," it did not address the applicability of the "intended or expected" exclusion.[7]

With regard to the standard of review used by this Court when considering a declaratory judgment entered in tandem with summary judgment, we consider "'whether that declaration was correct as a matter of law.'" *Catalyst Health Solutions, Inc. v. Magill*, 414 Md. 457, 471, 995 A.2d 960, 968 (2010), quoting *Olde Severna Park Improvement Ass'n, Inc. v. Gunby*, 402 Md. 317, 329, 936 A.2d 365, 371 (2007). We review a grant of summary judgment on the following basis:

> The question of whether the trial court properly granted summary judgment is a question of law and is subject to *de novo* review on appeal. *Standard Fire Ins. Co. v. Berrett*, 395 Md. 439, 450, 910 A.2d 1072, 1079 (2006); *Miller v. Bay City Prop. Owners Ass'n, Inc.*, 393 Md. 620, 632, 903 A.2d 938, 945 (2006), quoting *Myers v. Kayhoe*, 391 Md. 188, 203, 892 A.2d 520, 529 (2006); *Ross v. State Bd. of Elections*, 387 Md. 649, 658, 876 A.2d 692, 697 (2005); *Todd v. MTA*, 373 Md. 149, 154, 816 A.2d 930, 933 (2003); *Beyer v. Morgan State Univ.*, 369 Md. 335, 359, 800 A.2d 707, 721 (2002). If no material facts are in dispute, we must determine whether summary judgment was correctly entered as a matter of law. *Standard Fire Ins. Co.*, 395 Md. at 450, 910 A.2d at 1079; *Ross*, 387 Md. at 659, 876 A.2d at 698; *Todd*, 373 Md. at 155, 816 A.2d at 933; *Beyer*, 369 Md. at 360, 800 A.2d at 721. On appeal from an order entering summary judgment, we review "only the grounds upon which the trial court relied in granting summary judgment." *Standard Fire*, 395 Md. at 450, 910 A.2d at 1079; *Ross*, 387 Md. at 659, 876 A.2d at 698, quoting *Eid v. Duke*, 373 Md. 2, 10, 816 A.2d 844, 849 (2003), quoting in turn *Lovelace v. Anderson*, 366 Md. 690, 695, 785 A.2d 726, 729 (2001).

*River Walk Apartments, LLC v. Twigg*, 396 Md. 527, 541-42, 914 A.2d 770, 778-79

---

[7] Although we do not address the "intended or expected" exclusion, our reversal of summary judgment may resurrect the issues involved in the exclusion, when this case is once again heard.

(2007).

Before this Court, Mr. Springer argues that the "business pursuit" exclusion of his policy does not apply because, he asserts, he was not "actively managing or operating, or participating in the management or operation of a business" at the time of the events alleged in the J.G. Wentworth litigation. Mr. Springer points to the "contradictory and ambiguous" allegations in the J.G. Wentworth complaint, which stated Sovereign Funding Group had forfeited its corporate status as of 2009 and that Mr. Springer's wife, not Mr. Springer himself, had served as its CEO. Mr. Springer also emphasizes that he provided extrinsic evidence to Erie, in the form of a letter from his attorney, demonstrating that he was no longer affiliated with the Sovereign Funding Group and that he was only acting in his personal capacity during the time period subject to J.G. Wentworth's complaint.

Moreover, Mr. Springer urges this Court to require Erie to consider more than the face of the complaint before denying his claim, stating two factors explored by various tribunals when determining whether a business pursuits exclusion applies: continuity and profit motive. Mr. Springer, relying on such cases, argues that the business pursuits exclusion is inapplicable without a finding that an individual has continuously engaged in a certain field of business without a significant break. In the present case, Mr. Springer asserts:

> Here, there is no continuity in the business pursuits Springer was alleged to have engaged in. No evidence demonstrated that Springer was acting within his "customary engagement" or "stated occupation" when he engaged in the alleged defamation. Rather, the evidence demonstrated only

14

that Springer was *previously* in the business of structured settlements in connection with [Sovereign Funding Group], but that he had discontinued his involvement in that business.

Similarly, when addressing the profit that Mr. Springer stood to gain from his alleged defamation against J.G. Wentworth, he again focuses on the scant record developed in the trial court, stating:

> Nor is there evidence of a "profit motive" for the alleged defamation. . . . The Underlying [J.G. Wentworth] Complaint contained a bare allegation that Springer was connected to the structured settlement business, but that allegation was refuted by Springer himself when he, through counsel, informed his Erie agent that he was not . . . The only evidence before Erie when it denied coverage was that Springer was *not* engaged in business pursuits related to structured settlements or [Sovereign Funding Group]. Thus, Springer would have had no profit motive to engage in the alleged defamation.
>
> The evidence presented to Erie demonstrated that Springer was not engaged in business pursuits, was not actively managing or operating a business, and was not motivated by profit. At best, the evidence was contradictory on this issue.

In response to Mr. Springer's argument, Erie relies primarily on the language of the policy to argue that the Circuit Court properly granted its motion for summary judgment. Erie also contends that "there is no need to refer" to evidence outside of the J.G. Wentworth complaint, because a court should first interpret the policy and determine "whether there is coverage for the allegation actually made in the tort complaint."

When examining an insurance policy, we begin by applying established contract principles to its language. *Moscarillo v. Professional Risk Management Services, Inc.,* 398 Md. 529, 540, 921 A.2d 245, 251 (2007). In deciding an issue of coverage under an

15

insurance policy, the foremost rule "of construction is to apply the terms of the insurance contract itself." *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.,* 330 Md. 758, 779, 625 A.2d 1021, 1031 (1993); *Mitchell v. Maryland Casualty Co.*, 324 Md. 44, 56, 595 A.2d 469 (1991); *Mut. Fire, Marine & Inland Ins. Co. v. Vollmer*, 306 Md. 243, 250, 508 A.2d 130 , 133 (1986). When interpreting an insurance policy, we give the words of the policy their "'customary, ordinary, and accepted meaning.'" *MAMSI Life & Health Ins. Co. v. Callaway*, 375 Md. 261, 279, 825 A.2d 995, 1005 (2003), quoting *Mitchell,* 324 Md. at 56, 595 A.2d at 475.

The "business pursuits" exclusion states that Erie will not cover personal injuries "arising out of business pursuits," and contains two key phrases, "arising out of" and "business pursuits." The term "arising out of" is undefined in the policy, and the parties suggest different meanings to us. Mr. Springer argues that he was "not actively engaged in business" with the Sovereign Funding Group at the time of the alleged torts and he specifically argues that he did not "'actively manage[] or operate[], or participate[] in the management or operation'" of a business, quoting our opinion in *Zurich Insurance Co. v. Friedlander*, 261 Md. 612, 617, 276 A.2d 658, 660 (1971). Erie counters this argument by pointing to our broad definition of "arising out of" and noting that the "business pursuits" exclusion does not require an active engagement. The Circuit Court found, citing *Northern Assurance Co. of America v. EDP Floors, Inc.,* 311 Md. 217, 230, 533 A.2d 682, 688 (1987), that "[t]here is no requirement that Plaintiff be currently engaged in

16

such business, but rather that the action 'arose out of' Plaintiff's business pursuits."

In *EDP Floors*, we did construe the phrase "arising out of" to equate to "originating from, growing out of, flowing from, or the like." 311 Md. at 230, 533 A.2d at 688. The case itself was a claim filed against EDP by an individual who was injured by the alleged negligence of an employee of EDP while assisting in the unloading of a truck. EDP sought coverage from its insurer in the tort action, despite an exclusion in the insurance policy stating that the insurer would not cover "bodily injury . . . arising out of the . . . loading or unloading" of a truck. *Id.* at 224-25, 533 A.2d at 686. According the phrase "arising out of" its plain meaning, we held that the policy exclusion clearly provided that there would be no coverage for injuries arising out of the loading or unloading of a vehicle, regardless of the intervening negligence of the employee. We explained that while the "arising out of" phrase "plainly import[s] a causal relation of some kind," it does not require that unloading of the truck to be the "*sole* 'arising out of' cause of the injury." *Id.* at 230, 533 A.2d at 689 (emphasis added). Negligence of the employee contributing to the injury did not vitiate the relationship of the unloading of the truck to the insurance policy. *See also Aragona v. St. Paul Fire & Mar. Ins. Co.,* 281 Md. 371, 378 A.2d 1346 (1977).

In *Mass Transit Admin. v. CSX Transp., Inc*., 349 Md. 299, 708 A.2d 298 (1998), we interpreted a clause in a state procurement contract which required the Mass Transit Administration to indemnify CSX Transportation (CSXT) from "liability of every kind *arising out of* the Contract Service under this Agreement." 349 Md. at 301, 708 A.2d at

17

300) (emphasis in original). After a MARC passenger train collided with a backhoe being operated in the area, CSXT sought indemnification from MTA for the damages. In denying the claim, the MTA argued that the negligence of CSXT caused the accident. We rejected that argument, however, and stated that the negligence did not "diminish the fact that the damage to the backhoe *arose out of* the collision with the MARC train, just as the insured's negligence in *EDP Floors* . . . did not diminish the fact that the personal injuries in that case *arose out of* unloading the truck." *Id*. at 312, 708 A.2d at 305 (emphasis added). We reaffirmed our interpretation of "arising out of," noting that oft-cited insurance treatises also embrace that "arising out of" equates to:

> "originating from, growing out of, flowing from, or the like." *See, e.g.*, 6B J.A. Appleman & J. Appleman, *Insurance Law and Practice* § 4317, at 360-63 (R.B. Buckley ed., 1979) (in the context of automobile insurance, the words "arising out of" have "broader significance than the words 'caused by', and are ordinarily understood to mean originating from, incident to, or having connection with the use of the vehicle"); 12 G.J. Couch, *Couch Cyclopedia of Insurance Law* § 45:61, at 294 (2d ed. 1981) ("[T]he words 'arising out of' . . . generally mean 'originating from,' 'growing out of,' or 'flowing from.'"); 1 R.H. Long, *The Law of Liability Insurance* § 1.22, at 1-57 (1972) ("The phrase 'arising out of' is not to be construed to mean 'proximately caused by.' . . . The words 'arising out of' mean causally connected with, not 'proximately caused by' use.").

*Id.* at 315, 708 A.2d at 306.

Determining that "arising out of" has a broad definitional meaning, however, does not answer the question presented, and thus, we must explore the parameters of "business pursuits" in the Erie exclusion. "Business" is defined in the Erie policy as "any full-time, part-time or occasional activity engaged in as a trade, profession or occupation," but the

18

exclusion does not describe what is meant by "business pursuits." The implicit purpose of the exclusion is to remove from a homeowner's policy a type of coverage which would normally require specialized underwriting, requiring a higher premium. *See, e.g., Erickson v. Christie*, 622 N.W.2d 138, 140 (Minn. App. 2001) ("The function of a business pursuits exclusion is to confine the homeowner's policy coverage to nonbusiness risks and to relegate business coverage to a commercial policy."); *Wiley v. Travelers Ins. Co.,* 534 P.2d 1293, 1295 (OK. 1974) ("The object to be accomplished by the homeowner's policy was to insure a home and not a business.").

Although a business pursuits exclusion is often a standard clause in a homeowner's insurance policy, we have not had the opportunity to explore its function. *See, e.g., Pettit v. Erie Insurance Exchange,* 349 Md. 777, 789 n.7, 709 A.2d 1287, 1294 n.7 (1998); *Litz v. State Farm Fire and Cas. Co.*, 346 Md. 217, 235 n.6, 695 A.2d 566, 574 n.6 (1997) (noting that although the case involved issues relating to a business pursuits exception, the Court ultimately "intimate[d] no opinion on whether the circuit court was correct to conclude that the babysitting in this case constituted a business pursuit"); *Zurich*, 261 Md. at 617, 276 A.2d at 660 (holding that "the mere ownership of and the receipt of rent from improved real estate do not cause the owner and recipient to be engaged in business but, if he actively manages or operates, or participates in the management or operation of the property, he may be"); *see also Canal Ins. Co. v. Underwriters at Lloyd's London*, 435 F.3d 431, 437 (3d Cir. 2006) (explaining that "business pursuits" exclusions are standard in many

19

homeowners' insurance policies).

Our own intermediate appellate court has had the opportunity to construe a "business pursuits" exclusion in a number of contexts, one being that of a woman who sought coverage from her homeowner's insurance policy when one of the seven children she was babysitting in her home died due to her alleged negligence. *McCloskey v. Republic Ins. Co.,* 80 Md. App. 19, 22-25, 559 A.2d 385, 386-88 (1989). The babysitter argued that because she was not licensed as a child care provider, she was not engaging in a business pursuit or operating a business. *Id.* at 23, 559 A.2d at 386. The Court of Special Appeals rejected that argument, however, and found that where the insured "actively engaged in an occupational pursuit requiring the devotion of her energy, time and thought, and for which she received compensation," her activity "[u]nquestionably" constituted a business pursuit. *Id.* at 25-26, 559 A.2d at 388.

The Court of Special Appeals also considered the "business pursuits" exclusion in the context of a policy which failed to define "farming" as a business with regard to an incident that occurred on a farm which bred and raised horses. *Aetna Cas. & Sur. Co. v. Brethren Mut. Ins. Co.*, 38 Md. App. 197, 205, 379 A.2d 1234, 1239 (1977). Our brethren examined the activities of the farm and, even after construing "the ambiguity in this case . . . against the company which prepared the policy and in favor of the insured," held that the trial court erred in not upholding the "business pursuits" exclusion. *Id.* at 214, 379 A.2d at 1243.

The Court of Special Appeals' opinion, however, did not analyze what variables, if any, must enter an insurer's analysis when determining the effect of the business pursuits exclusion. Commentators, as well as a variety of our sister courts, have done a functional analysis of the phrase to encompass continuity and profit motive.

The oft-cited *Appleman on Insurance* has enumerated continuity and profit motive as components of a two-pronged test to determine if an activity is a "business pursuit":

> Courts will frequently utilize a two-pronged test in deciding whether an activity qualifies as a "business pursuit": whether the insured has (1) continuity, that is, a continued or regular activity for the purpose of earning a livelihood; and (2) a profit motive, or the showing that the activity is undertaken for a monetary gain. Moreover, the "usual non-business pursuits" provision "focuses on the objective nature of the activity itself rather than on the motivation of the policy holder."

New Appleman on Insurance Law Library Edition § 53.06[2][d][i] (footnotes omitted). In this regard, continuity is identified as "a continued or regular activity for the purpose of earning a livelihood," and profit motive as "the showing that the activity was undertaken for a monetary gain." *Id.*

Some of our sister courts have embraced this functional analysis. In *AMCO Ins. Co. v. Beck*, 929 P.2d 162 (Kan. 1996), for instance, a couple sought coverage under their homeowners' insurance policy when their teenage daughter was babysitting at their home and the child she was babysitting was injured in an accident. *Id.* at 164. The parents of the injured child sued the teenager's parents who then sought coverage under their homeowners' policy. *Id.* The Supreme Court of Kansas held that the business exclusion

21

in the policy did not preclude coverage and adopted a rule which stated:

> To constitute a business pursuit, there must be two elements: first, continuity, and secondly, the profit motive; as to the first, there must be a customary engagement or a stated occupation; and, as to the latter, there must be shown to be such activity as a means of livelihood, gainful employment, means of earning a living, procuring subsistence or profit, commercial transactions or engagements.

*Id.* at 166 (internal quotations omitted); *see also Sun Alliance Ins. Co. of Puerto Rico, Inc. v. Soto,* 836 F.2d 834, 836 (3d Cir. 1988) (an activity is a "business pursuit" when there is both continuity and a profit motive); *Heggen v. Mountain West Farm Bureau Mut. Ins. Co.,* 715 P.2d 1060, 1062 (Mont. 1986) (stating that in defining "business pursuit," jurisdictions often address "the idea of profit or profit motive, and most have required some level of continuity or regularity of the activity"); *Industrial Indem. Co. v. Goettl,* 674 P.2d 869, 872 (Ariz. 1983) ("'[B]usiness pursuits' denotes 'a continued or regular activity for the purpose of earning a livelihood . . . .'").

Other courts have held that seasonal or occasional activities do not meet the continuity requirement. *See, e.g., MFA Mut. Ins. Co. v. Nye*, 612 S.W.2d 2, 4 (Mo. App. 1980) (finding occasional summer lawn maintenance by insured's son did not qualify as business pursuit); *but see also Rufener v. State Farm Fire & Cas. Co.,* 585 N.W.2d 696, 698 (Wis. 1998) (noting that "part-time businesses are businesses for the purposes of the exclusion"). Activities that only occupy the insured's spare time, without a regular commitment, have been found not to constitute business pursuits, as have cases where the insured only engaged in the alleged activity once. *See, e.g., Millers' Mut. Ins. Ass'n of*

22

*Illinois v. Pennington*, 888 S.W.2d 406, 407 (Mo. App. E. Dist. 1994) (reasoning that where a babysitter's services were not "occasional, casual or temporary or for the convenience of friends or relatives," the activity met the continuity requirement).

With respect to profit motive, our sister courts are divided regarding whether the activity under scrutiny must be the insured's sole means of income or whether the business pursuits exclusion may apply to part-time or occasional work. *See, e.g., Stuart v. American States Ins. Co.,* 932 P.2d 697, 699 (Wash. App. 1997) ("A profit motive is a necessary consideration in evaluating whether a pursuit is in fact a business."); *Travelers Indem. Co. v. Fantozzi,* 825 F.Supp. 80, 85 (E.D.Pa. 1993) (babysitting had a profit motive because it was a way to earn income); *Stoughton v. Mut. of Enumclaw*, 810 P.2d 80, 83 (Wash. App. 1991) (holding that the activity need not be solely motivated by profit, nor a major source of livelihood to demonstrate profit motive); *Wiley v. Travelers Ins. Co.,* 534 P.2d 1293, 1295 (OK 1974) ("Profit motive, not actual profit, makes a pursuit a business pursuit.").

Adopting the functional tests of continuity and profit motive to interpret the business pursuits exclusion requires that we review our cases in the duty to defend area to determine what standards we have applied to insurers when they review third party complaints filed against their insured. In our duty to defend jurisprudence, we have limited situations in which we have permitted visceral denials of an insured's duty to defend or those that rely solely on the four corners of a third party complaint. For

23

example, in *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 397-98, 347 A.2d 842, 844 (1975), we were faced with the question of whether an insurance company, Transamerica, "was entitled to a declaratory judgment that it had no obligation to either defend or indemnify its insured," Mrs. Mary Brohawn, in tort actions brought by a third party after Mrs. Brohawn had pled guilty to a criminal charge resulting from the same incident. After Mrs. Brohawn pled guilty to an assault charge, she then requested a legal defense from her homeowners' insurer in a civil suit brought against her. [8] Transamerica sought a declaratory judgment that it was not required to defend, because, it asserted, in light of the guilty plea, it was clear that Mrs. Brohawn's actions constituted torts which were excluded from coverage. Mrs. Brohawn, however, argued that her plea did not constitute an admission of liability.

We held that Mrs. Brohawn's guilty plea did not conclusively establish her liability and that she should have had her day in court to establish her entitlement to a legal defense provided by her insurer in the civil action. In discussing whether a declaratory judgment was proper, we explained that "under some circumstances," a declaratory judgment action would be appropriate where, "an insurance company claims lack of coverage because of the insured's failure to comply with contract provisions such as the cooperation or notification clause, or failure to pay premiums". *Id.* at 405, 347 A.2d at 848. We

---

[8] As we described the criminal trial in the *Brohawn* opinion, "Testimony heard by the court before accepting guilty plea . . . revealed conflicting accounts of what occurred . . . ." *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 398, 347 A.2d 842, 845 (1975).

abjured, however, the entry of a declaratory judgment:

> If the issue upon which coverage is denied were not the ultimate issue to be determined in a pending suit by a third party, a declaratory judgment would be appropriate. But where, as here, the question to be resolved in the declaratory judgment action will be decided in pending actions, it is inappropriate to grant a declaratory judgment.

*Id.* at 406, 347 A.2d at 849.

In *St. Paul Fire & Marine Ins. Co. v. Pryseski,* 292 Md. 187, 194, 438 A.2d 282, 286 (1981), we held that when a "question of coverage or defenses under the language or requirements of the insurance policy is separate and distinct from the issues involved in the tort suit," it is our function "to interpret the policy and decide whether or not there is coverage."  Mr. Pryseski was accused of, *inter alia*, tortious assault and battery while he was collecting a monthly payment from a client.  Mr. Pryseski's employer was insured by St. Paul Fire & Marine Insurance and, even though St. Paul provided a defense for Mr. Pryseski's employer, it refused to provide Mr. Pryseski with a legal defense.  St. Paul claimed that Mr. Pryseski was not acting within the scope of his employment when he allegedly committed the assault and battery, and that his actions constituted "willful acts" which were not covered by the policy.  Mr. Pryseski instituted his own legal defense and then brought suit against St. Paul seeking a declaratory judgment that it was required to defend.  Before trial began in either the tort suit or the declaratory judgment action, St. Paul settled the lawsuit on behalf of Mr. Pryseski's employer and the release executed also expressly released Mr. Pryseski.  Mr. Pryseski in his own lawsuit was awarded monetary

damages for having had to pay his own legal fees.

Relying on *Brohawn*, our intermediate appellate court affirmed the trial court and held that "while coverage cannot be established clearly from the facts alleged" in the underlying tort suit, it was clear that St. Paul was obligated to defend Mr. Pryseski, because "the allegations were sufficient to indicate a possibility that the claim in question was covered by the terms of the policy." *Id.* at 192-93, 438 A.2d at 285 (internal citations and quotations omitted). We agreed and stated that, "[i]n light of the allegations of the tort suit concerning scope of employment and ratification, the Court of Special Appeals in this case correctly held that the tort suit determined the scope of employment issue."[9] *Id.* at 196,

---

[9] The final outcome of the *Pryseski* case is particularly instructive. In that case, although the Court held that the underlying tort suit determined the scope of employment issue that was at the heart of the coverage dispute, we, nevertheless, remanded for further evidentiary hearings when we determined that a key definition in the insurance policy had not been admitted into evidence at the earlier trial. We instructed:

> Upon remand, St. Paul may offer the definition of "occurrence" said to have been found in the "policy jacket." The authenticity of this document, whether it was actually part of the policy issued to Sun Life under which Pryseski was a named insured, and the probative value of the "definition," are matters for the trial court in the first instance. Also upon remand both sides shall be entitled to introduce any additional admissible extrinsic evidence relevant to the meaning of "occurrence" in the policy. If the trial court is unable to resolve the ambiguity upon the evidence introduced, if any, then the ambiguity should be resolved against St. Paul as the party preparing the contract.

*St. Paul Fire & Marine Ins. Co. v. Pryseski,* 292 Md. 187, 200, 438 A.2d 282, 289 (1981); s*ee also BGE Home Products & Services, Inc. v. Owens,* 377 Md. 236, 242, 833 A.2d 8, 12 (2003) (affirming, in part, a circuit court decision to deny summary judgment where a question regarding the scope of permission to drive a vehicle was a key issue that "must be

438 A.2d at 287. In so holding, we established a two-part inquiry to determine whether an insurer has a duty to defend:

> In determining whether a liability insurer has a duty to provide its insured with a defense in a tort suit, two types of questions ordinarily must be answered: (1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) do the allegations in the tort action potentially bring the tort claim within the policy's coverage? The first question focuses upon the language and requirements of the policy, and the second question focuses upon the allegations of the tort suit. At times these two questions involve separate and distinct matters, and at other times they are intertwined, perhaps involving an identical issue.

*Id.* at 193, 438 A.2d at 285. We also have consistently held that the duty to defend should be construed liberally in favor of the policyholder. *Litz*, 346 Md. at 231, 695 A.2d at 572; *Aetna Cas. & Sur. Co. v. Cochran*, 337 Md. 98, 107, 651 A.2d 859, 863 (1995); *see also Nationwide Ins. Companies v. Rhodes*, 127 Md. App. 231, 239, 732 A.2d 388, 392 (1999).

Application of the *Brohawn* and *Pryseski* duty to defend principles in the interpretation of the business pursuits exclusion in the present case, in which continuity and profit motive must be evident, yields the conclusion that the allegations on the face of the J.G. Wentworth complaint were not sufficient to trigger the business pursuits exclusion and thereafter, to support the entry of summary and declaratory judgments on Erie's behalf. The complaint merely alleged that Mr. Springer was CEO of the Sovereign Funding Group and that Mr. Springer made statements about J.G. Wentworth in order to gain an unfair

resolved by the factfinder" (internal quotations and citation omitted)).

business advantage against them, although it also contained contradictory information possibly indicating that the Sovereign Funding Group was no longer a viable business entity according to the records of the State Department of Assessments and Taxation. There was no information at all regarding profit motive.

As a result, Erie and the trial court subsequently could not rely on the face of the J.G. Wentworth complaint to establish Mr. Springer's alleged business interests and his profit motive. We vacate the declaratory and summary judgments entered and remand the case for further proceedings to explore the continuity of Mr. Springer's interests in the Sovereign Funding Group and any profit motive on his part at the time of the alleged defamatory statements against J.G. Wentworth.

**JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY VACATED, AND CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE ERIE INSURANCE EXCHANGE.**