**REPORTED**

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 128

September Term, 2016

_____

STATE OF MARYLAND

v.

MERRITT PAVILION, LLC, *et al.*

_____

Eyler, Deborah S.,
Arthur,
Sharer, J. Frederick
　(Senior Judge, Specially Assigned),


JJ.
_____

Opinion by Arthur, J.
_____

Filed:  November 29, 2016

This case principally concerns the powers of the Maryland Board of Public Works, "the highest administrative body in the Maryland state government." Alan M. Wilner, *The Maryland Board of Public Works: A History* (1984), at ix. Consisting of the Governor, the Comptroller of the Treasury, and the Treasurer, the Board of Public Works has the constitutional authority to "hear and determine such matters as affect the Public Works of the State, and as the General Assembly may confer upon them the power to decide." Md. Const. Art. XII, § 1.

A regulation promulgated by the Board of Public Works requires counties to obtain the Board's approval before disposing of former public school property. Separately, Baltimore County had agreed, in a covenant in a 1981 deed, that it would not convey a specific school property without the Board's consent.

In 2014 Baltimore County reached an agreement with a private developer to sell portions of that former school property. Before the Board of Public Works made a final decision to approve or disapprove the sale, the developer sought a declaratory judgment that the 1981 covenant was invalid. The State intervened, arguing that the Board of Public Works' regulations governed the proposed disposition of the property. On cross-motions for summary judgment, the Circuit Court for Baltimore County declared that (1) the covenant was "invalid and of no legal force or effect" and (2) that the regulation was "inapplicable to and unenforceable against the contract of sale" between the County and the developer.

We reverse that judgment. The regulation governs the transaction, and it requires the County to obtain the Board of Public Works' approval before disposing of the

property.  As a result of that determination, it is unnecessary to declare the parties' rights under the covenant.

FACTUAL AND PROCEDURAL BACKGROUND

**A.      Transfer of Surplus School Property to Baltimore County**

In the early 1950s, the Baltimore County Board of Education[1] purchased approximately 28 acres of land at the corner of Merritt Boulevard and Wise Avenue in Dundalk.  The property served as the site of North Point Junior High School until the school closed in 1981.  The County Board of Education determined at that time that the property was no longer needed for school purposes.

As of 1981, Maryland law placed a number of restrictions on the disposition of a "surplus" school by a county board of education.  Md. Code (1978), § 4-114(c) of the Education Article provided: "If, with approval of the State Superintendent [of Schools], a county board finds that any land, school site, or building no longer is needed for school purposes, it shall be transferred by the county board to the county commissioners or county council and may be used, sold, leased or otherwise disposed of, except by gift, by the county commissioners or county council."  The Board of Public Works, under its powers to regulate matters related to school construction, had delegated authority to the

---

[1] A county board of education is "a body politic and corporate" established by the General Assembly to operate within the geographic borders of each county.  *See* Md. Code (1974, 2014 Repl. Vol.), § 3-104(a) of Education Article.  "Despite their local focus, county boards of education are State agencies that are funded in part by the State and in part by their respective counties."  *Bldg. Materials Corp. of America v. Bd. of Educ. of Baltimore Cnty.*, 428 Md. 572, 576 (2012) (citations omitted).

Interagency Committee on School Construction (IAC)[2] to "review and approve . . . all proposals for the . . . disposition of school sites and buildings." Rule 8(b) of the Rules, Regulations and Procedures for the Administration of the School Construction Program (approved Sept. 7, 1977). More broadly, the Board of Public Works retained statutory power to impose conditions on transfers of State property to a county government, regardless of whether the property had been used as a school. Md. Code (1957, 1980 Repl. Vol.), Art. 78A, § 15 ("[a]ny real or personal property of the State of Maryland or of any board, commission, department or agency thereof . . . may be sold, leased, transferred, exchanged, granted or otherwise disposed of . . . to any county or municipality in the State subject to such conditions as the Board of Public Works may impose").

According to an opinion of the Attorney General, this legal framework permitted a local board of education to transfer surplus school property to a local government only if: (1) the State Superintendent approved of the local board's finding that the school was surplus, and (2) both the IAC and the Board of Public Works approved of the disposition. *See* 64 Md. Op. Att'y Gen. 118, 122-23 (1979); 65 Md. Op. Att'y Gen. 209, 212-13 (1980). In the exercise of its approval power, the Board of Public Works could direct the terms and conditions of any subsequent use or disposition of the property. 64 Md. Op. Att'y Gen. at 123. "To safeguard the State's interests, the Board of Public Works may

---

[2] The IAC, whose members include employees of other State agencies, was established by the Board of Public Works as a unit within the Department of Education. Md. Code (1978), § 5-302 of the Education Article.

impose appropriate conditions on the local jurisdictions, require that the conditions of its approval and appropriate termination provisions or covenants be included in the instruments of transfer and lease, and require that those instruments be recorded." 65 Md. Op. Att'y Gen. at 227.

Through a deed executed on October 22, 1981, the Baltimore County Board of Education disposed of the property that had been used as the site of North Point Junior High School. According to the deed, the County Board of Education had determined that the property was "no longer needed for school purposes[.]" "[I]n consideration of the sum of Five ($5.00) Dollars[] and other good and valuable considerations," the County Board of Education agreed to convey the property to Baltimore County "in fee simple." At the time of the conveyance, the State was still obligated in the amount of $89,808 on bond debt relating to the property.

The deed included the following covenant:

AND, [Baltimore County], acknowledging the financial interest of the State of Maryland in the property herein described, does hereby covenant that it will not convey, by deed, lease or other means, any portion of or interest in said property without first having received written consent thereto from the Board of Public Works of the State of Maryland. Such consent will not be unreasonably withheld.

The IAC reviewed the proposed transfer in accordance with the Board of Public Works' regulations. The IAC recommended that the Board approve the transfer subject to the understanding that Baltimore County would assume responsibility for $89,808 of the State's outstanding bond debt. The IAC also recommended that the following provision be incorporated into the transfer documents: "[A]pproval of the Board of Public

-4-

Works shall be obtained by Baltimore County prior to the transfer by it of any right, title, or interest in the school or site or any portion thereof, and the Board may attach such conditions to its approval, including the requirement that a pro-rata portion of the proceeds from the sale or lease of the school property be paid to the State, as it deems appropriate." In June 1982, the Board approved the transfer subject to those conditions.[3]

**B.      Baltimore County's Use and Proposed Disposition of the Property**

By the end of 1988, Baltimore County had paid off the outstanding bond debt on the property. Meanwhile, Baltimore County converted the former school building into the North Point Government Center, which was used primarily by county agencies such as the police department, recreation and parks department, and health department.

On the remaining portions of the property, the County maintained several athletic fields, including four baseball diamonds and three soccer fields. Those fields extend to the southern property line, which borders on additional athletic fields for an elementary school. This neighboring school, Grange Elementary School, has operated continuously since the 1960s.

By 2012, county officials no longer desired to continue to use the North Point property as a local government center. Consequently, the County solicited proposals from private developers for redevelopment of the property. The County accepted a proposal from Vanguard Commercial Development, Inc. ("Vanguard").

------

[3] Although the Board of Public Works approved the transfer in June 1982, it appears that only the original deed from October 1981 was recorded in the land records for Baltimore County.

By a contract executed in December 2013, the County agreed to sell approximately 15 acres of the 28-acre property to Vanguard for $2,105,355. The development plans called for the construction of a commercial complex that included offices, restaurants, and retail shops.[4] Vanguard agreed to build a new recreation center and to upgrade athletic fields on the other portion of the property, which would continue to be owned by the County.

After further negotiations, the County entered into an "Amended and Restated Contract of Sale" in November 2014. The new contract substituted Merritt Pavilion, LLC ("Merritt Pavilion"), an affiliate of Vanguard, as the purchaser. Merritt Pavilion agreed to purchase the approximately 15-acre portion of the property for a revised price of $7,600,000. The County agreed to assume responsibility for constructing the recreation center and for upgrading the athletic fields.

The contracts listed several conditions precedent to closing, including final approval of a planned unit development (PUD) that would permit commercial use of the property.[5] The transaction was not conditioned on obtaining approval from the Board of Public Works.

In 2015 Merritt Pavilion secured approval of the PUD from local administrative

---

[4] Prospective tenants include Johns Hopkins Medical Management Corporation, Chipotle Mexican Grill, and Five Guys Burgers and Fries.

[5] "Essentially, a PUD, when approved by a governmental body, grants a variety of uses within a development that would otherwise not be permitted" under zoning regulations. *Maryland Overpak Corp. v. Mayor & City Council of Baltimore*, 395 Md. 16, 22 n.4 (2006).

bodies. Nonetheless, some nearby residents, including Ms. Karen Cruz, were dissatisfied by the decision to permit commercial development on the property. Ms. Cruz and others petitioned for judicial review of the decisions authorizing the PUD. The Circuit Court for Baltimore County eventually heard the petition, but (as of the date of this opinion) the court has not yet issued a decision.

### C.    Baltimore County's Request for Approval by the Board

In July 2015, the County Executive for Baltimore County wrote to the IAC, requesting approval to dispose of the property. The letter quoted the final sentence of the 1981 covenant, which stated that the Board of Public Works' consent would "not be unreasonably withheld."

The IAC reviewed the request in accordance with Board of Public Works' regulations. Code of Maryland Regulations ("COMAR") 23.03.02.24(C) provides that "[a] county government proposing to dispose of former school property shall submit to the IAC a request for approval to dispose. The IAC shall review the request and make a recommendation to the Board of Public Works." COMAR 23.03.02.24(D) states that, upon receiving the recommendation, the Board of Public Works "may approve, disapprove, or conditionally approve the request to dispose of the former school property" and "may require that the disposition documents specifically incorporate the conditions."

One week after the County requested approval, Ms. Cruz and four other residents filed a complaint for declaratory and injunctive relief in the Circuit Court for Baltimore County. Their complaint named Baltimore County, Vanguard, and Merritt Pavilion as

defendants. Based on a variety of legal theories, the *Cruz* plaintiffs contended that selling

the property was an "illegal" and "*ultra vires* act of the County Executive and the County

Council." In Count One of their complaint, the *Cruz* plaintiffs asserted that both the 1981

deed covenant and COMAR 23.03.02.24 required the County to obtain the Board of

Public Works' approval before disposing of the property. Other counts of the *Cruz*

complaint alleged various abuses in the contract bidding process and the PUD approval.

The *Cruz* plaintiffs sought a declaration that the contracts were illegal and an injunction

preventing the County from conveying or redeveloping the property.

Vanguard, Merritt Pavilion, and Baltimore County each moved to dismiss the

*Cruz* complaint, primarily based on the issue of standing.

The IAC completed its review of the County's request in September 2015. The

IAC concluded that the proposed transfer did not involve outstanding State bond debt and

that the State was not entitled to receive proceeds from the sale. The IAC expressed

concern, however, about the "considerable" amount of community opposition to the

proposal. The IAC recommended that the Board of Public Works approve the disposition

along with a recommendation that the County "engage in further discussions with the

stakeholders in an attempt to accommodate stakeholder preferences and concerns."

The Board of Public Works placed the request on its agenda for a meeting on

October 7, 2015. During that meeting, the Lieutenant Governor announced that the

Governor's office had asked to pull the item from its agenda. He explained:

> The reason that we asked that the North Point sale be pulled from the
> Agenda, [was] because there are a number of concerns raised by the
> community with regard to the deal that was put in place. And we're asking

the county to work with the community to see if they can come up with a better plan. There are a lot of concerns in terms of the local usage of the facility. And so with that said we asked that they, the two parties come back together, work with the developer to come up with a better plan that meets the needs of the community.

The Comptroller enthusiastically "applaud[ed] the Governor for not voting" and joined the Governor "in sending this off the Agenda." Expressing his desire to deliver "a strong message for the citizens of Dundalk," the Comptroller announced that the project would not be approved unless it had "the support of every local official" and "every citizen group." The Treasurer commented that she supported the efforts to "work through a solution," but "really d[id]n't think zoning decisions should be made at the Board of Public Works."

Over the next several months, the Board of Public Works did not take further action to approve, disapprove, or conditionally approve the request.

### D.     The Declaratory Judgment Action to Invalidate the Deed Covenant

On January 7, 2016, Merritt Pavilion commenced this case by filing a one-count complaint for a declaratory judgment in the Circuit Court for Baltimore County. The complaint named Baltimore County as the sole defendant. Merritt Pavilion alleged that the County was unwilling to proceed under the contract without the Board of Public Works' approval.

The complaint made no mention of the Board of Public Works' regulations. Instead, Merritt Pavilion suggested that the obstacle to the sale was the covenant from the 1981 deed. Merritt Pavilion alleged that, because of "political considerations unrelated to any direct financial interest in the property[,]" the Board had "failed to act on a pending

-9-

request for consent to the transfer, even though the request ha[d] been pending for many months and even though the consent covenant expressly provides that consent may not be unreasonably withheld." Merritt Pavilion asked the court to declare that the 1981 deed covenant was "invalid and void as a matter of law because the State's financial interest in the property ha[d] been extinguished" and that "any further consent requirement would act as an unlawful restraint on the alienation of property."

Within one week, the County filed an answer in which it admitted every allegation in the complaint. Omitting any reference to the Board of Public Works' regulations, the County averred that the deed covenant was "the sole reason" why the County was "unable to proceed in accordance with the terms of the contract." The County asked the court to grant all relief requested by Merritt Pavilion.

A week after the County answered, Merritt Pavilion moved for summary judgment. On the same day, the County filed a response asking the court to grant summary judgment in Merritt Pavilion's favor.

When the Attorney General's Office learned of this unusual declaratory judgment action, the State moved to intervene, asserting that it was a necessary party to the proceedings. Merritt Pavilion and the County consented to the intervention.

The State opposed Merritt Pavilion's summary judgment motion and made a cross-motion for summary judgment in its own favor. The State asked the court to declare that the covenant was valid, but that "[e]ven in the absence of the challenged covenant, COMAR § 23.03.02.24 requires Baltimore County to seek and obtain the approval of the Board of Public Works before disposing of the former school[.]" Merritt

-10-

Pavilion responded by asking the court to declare that COMAR 23.03.02.24 was "inapplicable to and unenforceable against the pending contract of sale" of the property. The County adopted Merritt Pavilion's arguments.

The circuit court held a hearing on the cross-motions for summary judgment on March 17, 2016. During the hearing, an Assistant Attorney General informed the court that, just days earlier, he had learned of the separate declaratory judgment action in which Ms. Cruz and others had challenged the conveyance to Merritt Pavilion on the basis of the 1981 covenant and COMAR 23.03.02.24. He suggested that the two cases should be consolidated because both involved the same covenant. The court instructed the State to set forth its position in writing, and it proceeded to hear arguments on the summary judgment motions.

After the hearing, the State moved to consolidate the *Cruz* case with this case. Merritt Pavilion opposed the motion. The County adopted Merritt Pavilion's arguments.

On March 25, 2016, the court issued an order denying the State's motion to consolidate, granting Merritt Pavilion's motion for summary judgment, and denying the State's cross-motion for summary judgment. The court saw the issue as whether the covenant in the 1981 deed gave the State "veto power" over the proposed sale of a former school property from the County to Merritt Pavilion. The court also saw a "related issue" of whether the Board of Public Works' regulations "bestow an equivalent power upon the State."

In resolving those issues, the court wrote that "the singular intent and purpose" of the 1981 covenant and the Board of Public Works' regulations "was to allow the State of

Maryland to protect any financial interests it might have or might have had in the sale of the real property which had been used for public schooling, and in which the State had a financial stake." Because the State had not had any financial interest in the property in question since the County assumed and paid off the bond debt in the 1980s, the court declared the covenant to be "invalid and of no legal force and effect." Asserting that the regulations "mirror" the language in the covenant, the court declared them to be "inapplicable to and unenforceable against the contract of sale between Merritt Pavilion LLC and Baltimore County."

Judgment was entered on March 31, 2016.[6] The State filed a timely notice of appeal. Commenting that the State had been "engaging in a pattern of delay[,]" the court denied the State's request to stay the judgment pending the outcome of the appeal.

### E.    Other Post-Judgment Developments

While this appeal was pending, another judge dismissed the separate case in which Ms. Cruz and other citizens set out to enjoin the sale of the property on the ground the County needed to obtain the Board of Public Works' approval. The *Cruz* parties noted an

---

[6] For judgments entered on or after July 1, 2015, the date of entry of judgment is the date when the clerk makes "an entry of it on the docket of the electronic case management system used by that court along with such description of the judgment as the clerk deems appropriate." Md. Rule 2-601(b)(2). The clerk stamped the order to show that it was "filed" on March 31, 2016, and noted in the electronic case management system that Merritt Pavilion's motion for summary judgment was "Granted" on March 31, 2016, and that the State's cross-motion for summary judgment and motion to consolidate were both "Denied" on that date. For purposes of appellate jurisdiction, these notations qualify as "an entry" by the clerk under Rule 2-601(b)(2). Nevertheless, it would certainly be a better practice for clerks to make separately numbered and separately dated docket entries for each judgment.

-12-

appeal, which is pending as *Karen Cruz, et al. v. Baltimore County, et al.*, No. 585, Sept. Term 2016.

For reasons that are not adequately explained by the record, the attorney for the *Cruz* parties received notification that his clients were parties to this appeal. As a precaution, their attorney filed a one-page brief, which simply adopted the contents of the State's brief.

Baltimore County has moved to strike the *Cruz* parties and to strike their appellate brief. None of the other litigants have opposed that motion. Although the *Cruz* brief would have no effect on the outcome, we agree that Ms. Cruz and her fellow citizens are not parties to this appeal. The motion to strike the *Cruz* parties as appellees and to strike their appellate brief is granted. *See Surland v. State*, 392 Md. 17, 23-24 n.1 (2006) (holding that the Court of Special Appeals should strike an "appellee's brief" from a non-party).

Baltimore County has also moved to strike an appendix to the State's reply brief that reproduces the transcript of a motions hearing in the *Cruz* case and to strike all references to that appendix. The hearing took place about one month after the court issued its judgment in this case. The County argues that the *Cruz* transcript does not belong in an appendix because it was not part of the record before the circuit court when it rendered its judgment. The State responds that this Court can take judicial notice of the transcript for the limited purpose of demonstrating that Merritt Pavilion has taken inconsistent positions on the question of whether the *Cruz* case involves the same issues

-13-

as this case.[7]

We agree with the State that an official transcript of a court proceeding is the type of document "whose accuracy cannot reasonably be questioned." Md. Rule 5-201(b); *see Chesek v. Jones*, 406 Md. 446, 456 n.8 (2008) (taking judicial notice of facts from "official public documents" included in the appendix to an appellate brief). We decline to strike portions of the State's reply brief and the appendix to that reply brief.

## QUESTIONS PRESENTED

The State's brief presents three questions. Two questions relate to the correctness of the court's declaratory judgment, and the other question concerns the propriety of issuing any declaration without first consolidating this case with the *Cruz* case. We have reordered and reformulated these questions as follows:

> 1. Did the court abuse its discretion in denying the State's motion to consolidate the action with a related declaratory judgment action?
>
> 2. Did the circuit court err in concluding that the [Board of Public Works'] regulations for the disposition of former school property were inapplicable to and unenforceable against the disposition of the property?
>
> 3. Did the circuit court err in concluding that the deed covenant was invalid and of no legal force and effect?[8]

---

[7] In opposing the consolidation of this case with the *Cruz* case, Merritt Pavilion argued that the two cases involved different issues. In arguing for the summary disposition of the *Cruz* case, however, Merritt Pavilion argued that *Cruz* involved the "same issue" as this case and that the ruling in this case was dispositive of *Cruz*.

[8] As phrased by the State, the questions presented were:

-14-

We conclude that the court was not required to consolidate this case with the *Cruz* case.  Although the court acted properly in issuing a declaratory judgment under the circumstances, a conclusion in that declaration is incorrect.

<u>**DISCUSSION**</u>

**I.      <u>Consolidation of the Two Related Declaratory Judgment Actions</u>**

The State contends that, before issuing a declaratory judgment, the court should have consolidated the case with the pending declaratory judgment case involving Ms. Cruz and other Baltimore County residents.  In support of that contention, the State relied principally on *Haynie v. Gold Bond Building Products*, 306 Md. 644 (1986).  For four reasons, we reject the State's contention that *Haynie* militated in favor of consolidation.

---

1.  Did the circuit court err by declaring unenforceable duly promulgated legislative regulations that were neither challenged nor mentioned in the complaint, COMAR 23.03.02.23 and 23.03.02.24, the plain language of which mandates that Baltimore County must seek and obtain the approval of the Board of Public Works before transferring any interest in the former North Point Junior High School?

2.  Did the circuit court err by declaring invalid and unenforceable an unambiguous deed covenant that requires Baltimore County to seek and obtain approval of the Board of Public Works before transferring any interest in the former North Point Junior High School?

3.  Did the circuit court abuse its discretion by issuing a declaratory judgment when there was pending a previously-filed declaratory-judgment action involving the same parties, the same transaction, and the same deed covenant and regulations, where the circuit court identified no unusual or compelling circumstances while refusing a request to consolidate the two actions?

-15-

First, *Haynie* and its progeny[9] concern cases in which a party brings a declaratory judgment action to resolve a discrete issue that is currently pending in a preexisting common-law action. *Haynie* holds that, absent "very unusual or compelling circumstances," a court should not grant the declaratory judgment, but should instead decide the issues in the preexisting common-law action. *See Haynie*, 306 Md. at 652. On its face, *Haynie* does not apply here, because this case involves two, successive declaratory judgment actions rather than a conventional adversarial proceeding followed by a declaratory judgment action involving one of the same issues.

Second, the *Haynie* rule applies when the courts confront multiple actions involving the same issues and "the same parties" (*Waicker v. Colbert*, 347 Md. 108, 113 (1997)), or at least parties who are closely affiliated with one another (such as a corporation and its shareholders and directors). *Volkman v. Hanover Investments, Inc.*, 225 Md. App. 602, 615-16 (2015), *cert. granted*, 446 Md. 704 (2016). An agency comprised of the Governor, the Comptroller, and the Treasurer is, however, by no means the same or even substantially the same as the citizen-plaintiffs in *Cruz*. Nor are the issues in the two cases "identical," as the *Cruz* plaintiffs must overcome challenges to their standing before a court may properly reach the merits of their case. Moreover, the merits of the *Cruz* case involves issues that are not part of this case, such as the County's bidding process and the process of PUD approval.

---

[9] *See*, *e.g.*, *Waicker v. Colbert*, 347 Md. 108 (1997); *see also Volkman v. Hanover Investments, Inc.*, 225 Md. App. 602 (2015), *cert. granted*, 446 Md. 704 (2016).

Third, even if *Haynie* applied, it would not require (or even permit) consolidation of two actions. As previously stated, *Haynie* generally requires a court to refrain from granting a declaratory judgment if there is a preexisting common-law action involving the same (or substantially the same) parties and the same issue. *See Haynie*, 306 Md. at 652. *Haynie* does not require, permit, or even discuss consolidation.

Fourth and finally, the *Haynie* issue is moot. *See Surland*, 392 Md. at 31 (stating that a case is moot if appellate court cannot grant effective relief). After the circuit court declined to consolidate this case with the *Cruz* case, another circuit court judge dismissed the case brought by Ms. Cruz and her fellow citizens, and it is now the subject of a separate appeal. Consequently, even if we agreed that the circuit court should have consolidated the two cases (which we do not), we cannot order any effective relief, as we cannot order the circuit court to consolidate this case with a case that is no longer pending before it.

Under the circumstances, the circuit court did not abuse its discretion in denying the State's motion to consolidate the two declaratory judgment actions.

## II.     Applicability and Enforceability of Board Regulations

The circuit court issued its declaration as part of a ruling on cross-motions for summary judgment. The parties identified no factual disputes, and each side argued that it was entitled to judgment as a matter of law. Because the decision to grant summary judgment turns on a question of law, our task is to "review whether the circuit court was legally correct without according any special deference to the court's legal conclusions." *Payne v. Erie Ins. Exch.*, 442 Md. 384, 391 (2015) (citation omitted); *see also Springer v.*

*Erie Ins. Exch.*, 439 Md. 142, 155-56 (2014) ("when considering a declaratory judgment entered in tandem with summary judgment, we consider whether that declaration was correct as a matter of law") (citations and quotation marks omitted).

To analyze the judgment in this case, it is important to clarify that certain issues are outside the scope of the declaration. Throughout this case, Merritt Pavilion has suggested that the Board of Public Works acted unreasonably when it removed the North Point proposal from its agenda at the meeting in October 2015. Merritt Pavilion describes the Board's decision as "politically motivated." At oral argument, the State responded that the Board members' motives are irrelevant because, the State says, the Board's discretion is virtually unlimited.

Strictly speaking, however, this appeal does not concern the propriety of the Board's decision to withhold its consent (or, more precisely, its decision not to vote on the matter). As Merritt Pavilion wrote in its motion for summary judgment: "The question presented for declaratory judgment is not whether the [Board of Public Works] must grant consent, but whether the [Board of Public Works'] consent need even be sought by the County and Merritt Pavilion."

Similarly, the circuit court's declaration did not address the propriety of the Board's exercise of its approval power. Instead, the court declared that the approval power did not extend to this transfer in the first place and that the County had no obligation to seek the Board's approval. The court reached two conclusions: (1) that the covenant from the 1981 deed was "invalid"; and (2) that Board regulations were "inapplicable to and unenforceable against" the transaction.

-18-

Although the State challenges both aspects of that ruling, the State begins by contending that the circuit court erred in its determination that the Board's regulations could not govern the proposed transfer. For the reasons explained below, we agree that the court erred.

### A. Regulatory Authority of the Board of Public Works

The Maryland Constitution requires the General Assembly to establish and to provide for the maintenance of "a thorough and efficient System of Free Public Schools" throughout the State. Md. Const. Art. VIII, § 1. Public school construction was once a local concern, but through a series of loan programs during the twentieth century, the General Assembly gradually conferred supervisory power over school construction on the Board of Public Works. *See Bldg. Materials Corp. of America v. Bd. of Educ. of Baltimore Cnty.*, 428 Md. 572, 586-87 (2012).

The adoption of the Public School Construction Program in 1971 redefined and considerably expanded the State's role in financing and overseeing school construction. *Id.* at 587 (quoting Wilner, *The Maryland Board of Public Works*, *supra*, at 104). "The substantive heart of the new program was the legislative direction that 'from and after July 1, 1971, the State shall pay the costs in excess of available Federal funds of all public school construction projects and public school capital improvements in the counties and Baltimore City which have been approved by the Board of Public Works.'" Wilner, *The Maryland Board of Public Works*, *supra*, at 104 (quoting 1971 Md. Laws ch. 624, § 1, which created § 130A of former Art. 77 of the Maryland Code). That provision remains in effect today. *See* Md. Code (1974, 2014 Repl. Vol.), § 5-301(c) of the

Education Article.[10]

The 1971 Act expressly repealed "all laws or parts of laws, public general or public local" to the extent of "any . . . inconsistency" with its provisions.  1971 Md. Laws ch. 624, § 3.  As a major component of this program, the General Assembly authorized the Board of Public Works "to adopt 'rules, regulations, and procedures' on a broad range of activities related to school construction."  *Bldg. Materials*, 428 Md. at 587 (quoting 1971 Md. Laws ch. 624, § 1).  The current iteration of this statute provides that the Board "may adopt regulations for the administration of the programs provided for in this section."  Md. Code (1978, 2014 Repl. Vol.), § 5-301(d) of the Education Article.

Regulations adopted under section 5-301 are "treated as 'substantive' or 'legislative' regulations that are binding on the courts and have the 'force of law.'"  *Bldg. Materials*, 428 Md. at 591 (quoting *Sec'y, Dep't of Pub. Safety & Corr. Servs. v. Demby*, 390 Md. 580, 604-05 (2006)).  In contrast to an interpretive regulation, which does not result from a specific statutory grant and which merely expresses an agency's interpretation of what a statute means, "'a substantive or legislative rule, pursuant to properly delegated authority, has the force of law, and creates new law or imposes new rights or duties.'"  *Bldg. Materials*, 428 Md. at 591 n.25 (quoting *Demby*, 390 Md. at 604-05).

---

[10] Through other legislation, the State assumed a progressively larger share of the cost (and eventually the full cost) of debt service on school construction bonds incurred by local jurisdictions that were outstanding or obligated as of June 30, 1967.  *See* 64 Md. Op. Att'y Gen. at 119-20.

Subsection 5-301(g) gives the Board of Public Works "the ability to exercise control over all other agencies in the area of public school construction." *Bldg. Materials*, 428 Md. at 591. It provides:

> (g)(1) With respect to public school construction or public school capital improvements, including sites for school buildings, the authority, responsibilities, powers, and duties of the following are subject to the regulations adopted by the Board of Public Works under this section:
>
> > (i) The State Board [of Education];
> > (ii) The State Superintendent [of Schools];
> > (iii) The county governments;
> > (iv) The county boards; and
> > (v) All other State or local governmental agencies under this article.
>
> (2) If, as to public school construction or public school capital improvements, there is any conflict between the regulations and procedures of the Board of Public Works and the authority, responsibilities, powers, and duties of the individuals and agencies specified in paragraph (1) of this subsection, the regulations and procedures of the Board of Public Works shall prevail.

Md. Code (1978, 2014 Repl. Vol.), § 5-301(g) of the Education Article.

Under this provision, State and local government entities alike are subject to the Board of Public Works' regulations. *Bldg. Materials*, 428 Md. at 588 (explaining that the 1971 legislation made "all State and local officials involved in school construction subject to the [Board of Public Works'] rules and regulations"); *Beka Indus., Inc. v. Worcester Cnty. Bd. of Educ.*, 419 Md. 194, 205 (2011) (stating that "[t]he State, the State Superintendent, the county governments, and the county boards of education are all subject to school construction-related regulations promulgated by the Board of Public Works found in COMAR Title 23.03.02"); *Chesapeake Charter, Inc. v. Anne Arundel*

*Cnty. Bd. of Educ.*, 358 Md. 129, 140 n.5 (2000) (stating that "the county governments and all of the educational agencies, including the county school boards, are expressly made subject to" the Board's school construction program regulations).

In short, as to matters related to school construction, the Board's regulations are "supreme in case of a conflict" between those regulations and the powers of local authorities. *Ansell v. Howard Cnty. Council*, 264 Md. 629, 636 (1972); *see also* 64 Md. Op. Att'y Gen. at 121 (stating that "in the administration of the public school construction program, the power of the Board of Public Works is plenary and supreme").

**B.      Applicability of Board Regulations to the North Point Transactions**

The Baltimore County Board of Education conveyed the North Point Junior High School property to Baltimore County in 1981, under the statutes and regulations in effect at that time. As of 1981, Board of Public Works regulations required county boards of education to obtain approval from the IAC for the proposed disposition of any surplus school. 64 Md. Op. Att'y Gen. at 121 (discussing former Rule 8(b)). The IAC and the Board of Public Works approved the conveyance of the North Point property in 1982. Under its power to impose conditions on property transfers to a county (*see* Md. Code (1957, 1980 Repl. Vol.), Art. 78A, § 15), the Board of Public Works approved the transfer with the conditions that the County would assume the outstanding bond debt and that the transfer documents would require the County to obtain the Board's consent for any subsequent disposition of the property.

The Board's regulations concerning public school construction are now codified in Subtitle 3 of Title 23 of the Code of Maryland Regulations, which took effect on May 21,

2007.  COMAR 23.03.02.23 is the present-day counterpart of former Rule 8(b).  It

requires a local board of education to submit a request to the IAC for any proposed

transfer of a surplus school to a county government for approval by the Board of Public

Works and the IAC.  COMAR 23.03.02.23(C)-(D).  This regulation, however, governs

only an initial transfer of surplus school property to a county government, not a

subsequent disposition of property by the county government.  For this reason, COMAR

23.03.02.23 does not apply to Baltimore County's current proposal to convey the North

Point property to Merritt Pavilion.

The next regulation, COMAR 23.03.02.24, regulates "County Government

Disposition of School Property."  In full, it provides:

> A. Definition.
> (1)      In this regulation, the following term has the meaning indicated.
> (2)      Term Defined. "School property" means any land, school site, or
> school building.
>
> B. A county government:
> (1)      May use, sell, lease, or otherwise dispose of, except by gift, any
> former school property in accordance with this regulation; and
> (2)      Is encouraged to use the State Clearinghouse or similar procedures
> to make government agencies aware of the availability of former school
> property.
>
> C. A county government proposing to dispose of former school property
> shall submit to the IAC a request for approval to dispose. The IAC shall
> review the request and make a recommendation to the Board of Public
> Works.
>
> D. The Board of Public Works may approve, disapprove, or conditionally
> approve the request to dispose of the former school property. The Board
> may require that the disposition documents specifically incorporate the
> conditions.

Although this regulation defines the term "school property," it does not define the

term "former school property."  Nonetheless, under basic principles of construction (*see, e.g.*, *Crofton Convalescent Ctr., Inc. v. Dep't of Health & Mental Hygiene, Nursing Home Appeal Bd.*, 413 Md. 201, 216-17 (2010)), we interpret the word "former" in accordance with its ordinary meaning.  Thus, the term "former school property" includes the North Point property and its facilities, which had formerly been used as a public school.  Merritt Pavilion and Baltimore County have made no argument to the contrary.  Indeed, in a memorandum to the circuit court, Merritt Pavilion recognized that "[t]hese regulations facially apply to a county's further disposition of former school properties that previously had been transferred to a county by a county board of education."

Moreover, as Merritt Pavilion points out, the County complied with section C of this regulation.  In July 2015, the County Executive "submit[ted] to the IAC a request for approval to dispose" (COMAR 23.03.02.24(C)) of this property.  The IAC then "review[ed] the request and ma[d]e a recommendation" (*id.*) to the Board of Public Works in September 2015.  The IAC specifically recommended that the Board approve the proposal, with some conditions.  In these circumstances, any requirement of COMAR 23.03.02.24(C) has already been fulfilled.

The remaining issue is whether the Board of Public Works "may approve, disapprove, or conditionally approve" the County's request under COMAR 23.03.02.24(D).  The State contended that the Board had the power to do so.  The circuit court disagreed.

Our review of the grant of summary judgment in a declaratory judgment action normally involves "only the grounds upon which the trial court relied in granting

-24-

summary judgment." *See, e.g.*, *Springer v. Erie Ins. Exch.*, 439 Md. at 146 n.2 (citations and quotation marks omitted). The circuit court explained its reasoning as follows: the "singular intent and purpose" of COMAR 23.03.02.24 is to protect the State's financial interests in the sale of property; the State has no longer had a financial interest in this particular property since the 1980s;[11] and, therefore, those COMAR provisions are "inapplicable to and unenforceable against" Baltimore County's disposition of this property.

The State argues that the circuit court ignored principles of construction, which ordinarily require courts to give effect to the language of a regulation as written. *See, e.g.*, *Sail Zambezi, Ltd. v. Maryland State Highway Admin.*, 217 Md. App. 138, 150 (2014). The State contends that the regulation plainly applies to a county's disposition of former school property, regardless of whether the State retains any direct financial interest relating to the property. Treating COMAR 24.03.02.24(D) as "inapplicable," the State says, would either render its operative language meaningless or would impermissibly insert a new limitation not expressed in the language of the regulation.

We agree that the circuit court's conclusion, that the regulation is "inapplicable," does not follow from the court's stated premises. The language triggering the application

---

[11] The second premise is essentially undisputed: the State has not asserted that it continues to have any direct financial interest relating to this property. There is only a minor point of disagreement: the court wrote that the State's financial interest terminated when the County assumed responsibility for outstanding bond debt in 1982, but the State may have remained legally obligated for that debt until it was paid off in 1988. In either event, the State's direct financial interest in the property expired long before the County tried to sell the property to Merritt Pavilion.

of this regulation ("[a] county government proposing to dispose of former school property") is broad enough to include the transaction here. Nothing in this regulation or its surrounding provisions expresses an intent that the regulation should apply only to former school properties as to which the State retains a direct financial interest.

Moreover, we are aware of no principle (and the parties have identified none) that would permit a court to declare a regulation "inapplicable" merely because the court determines that the regulatory purpose has been achieved. Ordinarily, the purposes would be better achieved by allowing the agency (and not a court) to make the determination in the first instance.

The more fundamental problem with the court's stated rationale, however, is its narrow view of the purpose of the regulation. Because of how the parties presented this case, arguments about the regulation overlapped with arguments about the covenant. The circuit court discussed the covenant and the regulation together, writing that "the singular intent of both the consent covenant in the 1981 deed and the referenced COMAR provisions (23.03.02.23 and 23.03.02.24) was to allow the State of Maryland to protect any financial interests" in the sale of real property. But while the covenant expressly "acknowledg[es] the financial interest of the State of Maryland in the property," the regulation includes no statement of purpose, much less a "singular" purpose. As the text of the regulation does not mention the State's financial interest at all, it lends little support for an inference that a direct financial interest relating to the property is a condition for triggering the regulatory approval procedures.

Protecting State investments does appear to be one function of this regulation, but

the State of Maryland is not just an ordinary investor in matters related to school construction. "Manifestly, the State's involvement in [the public school construction program] extends beyond financing on a piecemeal basis." 64 Md. Op. Att'y Gen. at 124 n.9. The State's interest in the disposition of surplus schools "derives from a number of sources," including "the State's financial investment[s]" in school construction, as well as "the comprehensive and systematic powers and duties of the State in administering the public school construction program – powers and duties that have been conferred by §§ 5-301 and 5-302 on the Board of Public Works and its agent, the [IAC]." 65 Md. Op. Att'y Gen. at 212. The Board of Public Works' oversight responsibility is not strictly limited to short-term financial concerns, but extends to the long-term operation of the ongoing program. *See* 64 Md. Op. Att'y Gen. at 122 (concluding that "if the [IAC] should find, in a given case that a proposed disposition would thwart the operation of the program, it may act to disapprove the transaction"); Md. Code (1978, 2014 Repl. Vol.), § 5-301(d)(2)(i) of the Education Article (authorizing the Board to make requirements for the "development and submission of long range plans").

Discussions from a Board of Public Works meeting on May 6, 1981, reveal the Board's rationale (at least historically) for requiring the counties to seek Board approval for the conveyance of former school properties as to which the State no longer has a direct financial interest. At that meeting, the Board considered requests to approve transfers of four surplus schools to Baltimore County. The State was obligated to pay for the outstanding bond debt for each of those schools.

During that meeting, the Comptroller objected to a proposed covenant under

which the Board's approval power would end after 15 years or when "the bond debt is completely retired, whichever is earlier." The Comptroller asked the Board to consider what might happen if, in the future, the population increased in an area where a school had once closed down. The Executive Director of the State School Construction Program responded that it would be a "considerable expense" for the State either to "mothball" a school until it might be needed again or, in the alternative, to finance the construction of entirely new schools in response to a future population increase. The Treasurer promptly proposed an amendment that would eliminate any restriction on the Board's approval power. The Governor described the effect of the proposed amendment as follows: "if [the County] ever dispose[s] of the school, regardless of when, [the County would] have to come back for Board approval." The Board then voted to approve the covenants subject to the amendment. Other Board of Public Works records from this time period show that the Board imposed similar conditions when it approved other conveyances.[12]

Because the State has an ongoing responsibility to finance construction of schools and school-related improvements throughout the State, it is rational for the State to oversee transactions disposing of previously-constructed facilities in each county. Little imagination is required to see how the disposition of this particular property, which is

---

[12] The State points to the 1981 meeting as evidence of the purpose of the covenant for the North Point property. The Board of Public Works did not review the disposition of the North Point property at that meeting, but the covenant in the 1981 deed for that property may well have been affected by the Board's contemporaneous concerns. In any event, the Board members' comments at that meeting are as salient in 2016 (or at the time of the adoption of the Board's current regulations in 2007) as they were in 1981.

improved with multiple athletic fields, has an auditorium for public meetings, and is adjacent to an existing elementary school, would be of interest to the bodies responsible for financing school construction throughout the State. The requirement that the counties seek approval from the Board of Public Works to dispose of former school property, regardless of when the counties dispose of the property, safeguards long-term interests of the school construction program.

For those reasons, we conclude that COMAR 23.03.02.24 applies to Baltimore County's proposed disposition of this former school property. We reject the premise that the "singular purpose" of the regulation is to protect the State's financial interest in each individual property. We similarly reject the conclusion that the procedures of COMAR 23.03.02.24 only apply to properties as to which the State has a direct financial stake.

### C.        Enforceability of Board Regulation as to the North Point Transaction

In the circuit court, Merritt Pavilion argued that COMAR 23.03.02.24(C) "exceed[ed] the authority of the statutes" enabling that regulation and hence that the regulation was "not enforceable as to the County or Merritt Pavilion in this case." Without expressly adopting that argument, the court echoed and implicitly endorsed it in concluding that the regulation was "unenforceable." On appeal, Merritt Pavilion and the County argue that "[n]o Maryland statute could be read to enable these regulations to be applied" to the proposed disposition of the North Point property. We are unpersuaded that the statutes limit the Board of Public Works' regulatory authority in that manner.

Since the original enactment of the school construction program in 1971, the Board's power to make rules to administer the school construction program has always

-29-

been "broadly stated." Wilner, *The Maryland Board of Public Works*, *supra*, at 104.

Currently, section 5-301(d)(2) of the Education Article includes a list of areas in which

the Board may regulate:

> (d)(1) The Board of Public Works may adopt regulations for the administration of the programs provided for in this section.
>
> (2) The regulations adopted by the Board of Public Works may contain requirements for:
>
>> (i) The development and submission of long range plans;
>> (ii) The submission of annual plans and plans for specific projects;
>> (iii) The submission of other data or information that is relevant to school construction or capital improvement;
>> (iv) The approval of sites, plans, and specifications for the construction of new school buildings or the improvement of existing buildings;
>> (v) Site improvements;
>> (vi) Competitive bidding;
>> (vii) The hiring of personnel in connection with school construction or capital improvements;
>> (viii) The actual construction of school buildings or their improvements;
>> (ix) The relative roles of different State and local governmental agencies in the planning and construction of school buildings or school capital improvements;
>> (x) School construction and capital improvements necessary or appropriate for the proper implementation of this section;
>> (xi) At the recommendation of the Interagency Committee, the establishment of priority public school construction programs;
>> (xii) Development of cooperative arrangements that permit the sharing of facilities among two or more school systems;
>> (xiii) The selection of architects and engineers by school systems;
>> (xiv) The award of contracts by school systems; and
>> (xv) Method of payments made by the State under the Public School Construction Program.

Md. Code (1974, 2014 Repl. Vol.), § 5-301(d)(2) of the Education Article.

In addition, the statute states that the Board of Public Works' regulations "shall

contain provisions" relating to eight other items. *Id.* § 5-301(d)(3). The statute directs that: "In adopting any of these requirements, the State Board [of Education] and the Board of Public Works shall provide for the maximum exercise of initiative by school personnel in each county to ensure that the school buildings and improvements meet both the needs of the local communities and the rules and regulations necessary to ensure the proper operation of this section and the prudent expenditure of State funds." *Id.* § 5-301(d)(4). The statute also directs the Board of Public Works to develop its rules "in consultation with representatives of the county boards and the county governing bodies." *Id.* § 5-301(e).

The Board's authority to make regulations in matters related to school construction has never been expressly contingent on any direct State financial interest as to individual properties. Merritt Pavilion and the County have identified no provision that squarely supports their theory that the Board's regulatory authority extends only to properties as to which the State retains a direct financial interest. Merritt Pavilion and the County nevertheless contend that the Board lacks authority to regulate a county's subsequent transfer of former school property because "[t]he enumerated topics on which regulations may be adopted do not include anything specific to surplus schools, and certainly not specific to subsequent transfers of surplus schools after the initial transfer by a county board of education." To the contrary, the history of this statute reveals that the legislature did not intend to narrow the Board's regulatory power to those enumerated topics.

As originally enacted, the statute authorized the Board to prescribe requirements in

nine, unnumbered areas, as well as "*any other* requirements involving school construction and capital improvements necessary or appropriate for the proper implementation of this section." 1971 Md. Laws ch. 624, § 1 (creating § 130A(d) of former Article 77 of the Maryland Code) (emphasis added). When the General Assembly reenacted this provision in 1978 as part of the newly-codified Education Article, it reorganized the list into ten items, the tenth of which was: "school construction and capital improvements necessary or appropriate for the proper implementation of this section." 1978 Md. Laws ch. 22, § 2 (enacting Md. Code (1978), § 5-301(e)(2)(x) of the Education Article)). A Revisor's Note made it clear that this recodification did not effect a substantive change. *See* 1978 Md. Laws ch. 22, § 2, Revisor's Note to § 5-301(e)(2) of the Education Article (stating that, aside from the intentional deletion of a few obsolete provisions, "[t]he only other changes are in style"). Legislation passed in 2004 moved this provision to subsection (d); added five more areas for which the Board "may" make requirements (§ 5-301(d)(2)(xi) through (d)(2)(xv)); and specified the eight areas for which the Board "shall" make requirements (§ 5-301(d)(3)(i) through (d)(3)(viii)). *See* 2004 Md. Laws ch. 306, §§ 2, 3. Those provisions have remained unchanged since that time.

Overall, this statutory history undercuts any suggestion that the legislature intended to limit the Board of Public Works' regulatory authority to the specifically enumerated categories. The vague wording of subparagraph 5-301(d)(2)(x), which permits the Board to make requirements for "[s]chool construction and capital improvements necessary or appropriate for the proper implementation of this section[,]"

is a product of legislative design. This provision anticipates that the Board might find it "necessary or appropriate" to make additional regulations that do not fit neatly into any enumerated category. It confers some discretion on the Board to decide which requirements are "necessary or appropriate" for the implementation of the program.

"[C]ourts should generally defer to agencies' decisions in promulgating new regulations because they presumably make rules based upon their expertise in a particular field." *Fogle v. H & G Rest., Inc.*, 337 Md. 441, 455 (1995) (citation omitted). Moreover, "great weight should be accorded to the [Board of Public Works'] and IAC's interpretation of the public school construction statutes." *Bldg. Materials*, 428 Md. at 586 (citing *Demory Bros., Inc. v. Bd. of Pub. Works*, 273 Md. 320, 327 (1974)). The Board's decision to enact regulations that include requirements for the disposition of "any former school property," without limiting those requirements to properties in which the State retains a financial interest, reflects an implicit decision that all former school properties fall within the appropriate purview of the program. This decision is consistent with what appears to be the Board's longstanding practice of directing counties to sign transfer documents requiring the counties to seek Board approval at any time for disposal of former school property.

The State argues that precedent regarding other administrative agencies supports a broad and deferential interpretation of the Board of Public Works' regulatory power. *See Lussier v. Maryland Racing Comm'n*, 343 Md. 681, 687-90 (1996) (holding that statute broadly authorizing the Racing Commission to adopt regulations "to govern racing and betting on racing in the State" and specifying four types of regulations that the

Commission "may" adopt empowered the Commission to impose a penalty for misconduct in horse races even though statute did not expressly authorize that penalty); *Christ by Christ v. Maryland Dep't of Nat. Res.*, 335 Md. 427, 437-39 (1994) (holding that statute broadly authorizing Department of Natural Resources to issue regulations for the "operations of any vessels" authorized the Department to prohibit use of certain motor vessels by persons under age of 14 even without specific delegation of authority to do so); *see also Jacobson v. Maryland Racing Comm'n*, 261 Md. 180, 186 (1971) (holding that statute broadly authorizing Racing Commission to regulate "conditions under which all horse races shall be conducted" authorized the Commission to regulate the transfer of race horses even though the statute did not expressly address those transfers).

Merritt Pavilion and the County make token efforts to distinguish *Lussier* and *Jacobson* on the facts. They concede that *Christ* stands for "general propositions of state administrative law and separation of powers principles not in dispute here." Their arguments fail to address the State's contention that the Court of Appeals has "repeatedly rejected the argument," similar to the one they make here, "that the Legislature was required expressly or explicitly to authorize the particular regulatory action." *Lussier*, 343 Md. at 688 (citing *Christ*, 335 Md. at 437-39).

Merritt Pavilion and the County also argue that "Section 5-301 does not apply to the property in question here" because the "title" of that section is "'State payment of certain public school construction and capital improvement costs.'" That caption, however, was not part of the original 1971 enactment. It became part of Michie's

Annotated Code when the statute was recodified without substantive change as part the

Education Article. *See* 1978 Md. Laws ch. 22, § 1, Revisor's Note to Section 5-301 of

the Education Article.[13] Unless otherwise provided by law, the bold-faced "caption or

catchline" in the code "is intended as a mere catchword to indicate the contents of the

section or subsection" and "may not be considered as a title of the section" even "if the

section, subsection, caption, or catchline is amended or reenacted." Md. Code (2014), §

1-208 of the General Provision Article; *see Sanchez v. Potomac Abatement, Inc.*, 198 Md.

App. 436, 450 (2011) ("a caption to a section of the law, particularly one inserted by the

Legislature during a nonsubstantive code revision, should never be the determining factor

in deciphering legislative intent"). As a consequence, the caption does not create any

limitations not found in the operative language of the statute. *See State v. Holton*, 193

Md. App. 322, 362-65 (2010). Unquestionably, the subject matter of section 5-301 is

more expansive than the mere payment of State construction funds. The operative

provisions confirm the observation that the Board's "[a]dministration of the program is

comprehensive and systematic." 64 Md. Op. Att'y Gen. at 122 n.9.

In another (rather inventive) effort to uncover a legislative intent to limit the Board

of Public Works' regulatory authority, Merritt Pavilion and the County point to what is

now subsection (i) of section 5-301. In relevant part, it provides:

> Consistent with § 4-115 of this article and regulations adopted by the Board
> of Public Works to implement § 4-126 of this article, the Board of Public

---

[13] West's Annotated Code, which is also "evidence of" Maryland law (*see* Md. Code (1974, 2013 Repl. Vol.), § 10-201 of the Courts and Judicial Proceedings Article), uses the more general heading "Public school construction and capital improvements" for section 5-301 of the Education Article.

Works may require by regulation that the portion of the proceeds received by a county from the sale, lease, or disposal of any public school building that represent State funds provided within 15 years prior to the date of the transaction shall be used solely as part of the State funding of the construction of future public school buildings in the county in which the sale, lease, or disposal occurred, if the public school building was constructed under a contract executed on or after February 1, 1971.

Md. Code (1978, 2014 Repl. Vol.), § 5-301(i)(2) of the Education Article.

This subsection plainly "does not apply to the proceeds from the sale, lease, or disposition of public school buildings constructed under contracts executed before February 1, 1971." *Id.* § 5-301(i)(1). Accordingly, Merritt Pavilion and the County rightly concede that this subsection "is not directly applicable" here because North Point Junior High School was built in the early 1950s. Furthermore, the State has not asserted any claim to proceeds from the proposed sale of the North Point property. Merritt Pavilion and the County argue that this provision "nevertheless is instructive because it demonstrates, consistent with the entirety of Section 5-301, that the General Assembly's intent and interest in dispositions of public school buildings stems from the State's direct financial interest."

This sweeping view of the implications of subsection 5-301(i) is unjustified. This provision was not part of the original 1971 legislation that empowered the Board of Public Works to enact regulations. The predecessor to subsubsection (i) was added a few years later to address the proceeds from "the disposition of certain public school property[.]" 1973 Md. Laws ch. 299, preamble. The enactment did not purport to limit the Board's preexisting regulatory powers. If anything, this provision assumes that the Board may oversee "the sale, lease, or disposal" of school buildings that have been

transferred to a county government. It does not define the entire scope of that authority

over "the sale, lease, or disposal" of school buildings transferred to a county. Instead, it

merely circumscribes the Board's control of the proceeds of those transactions.[14]

In conclusion, section 5-301(d) contains a broad grant of rulemaking power in

matters related to school construction and improvements. That power is not strictly

limited to the enumerated areas in the statute. The statute as a whole does not express a

legislative intent to limit the Board of Public Works' regulatory power only to properties

in which the State retains a direct financial interest.

### D.    Alleged "Abrogation" of the County's Common Law Property Rights

As a final argument against the application of COMAR 24.03.02.24, Merritt

Pavilion and the County contend that the regulation is unenforceable because, they say,

enforcing the regulation would violate the County's common-law right to free alienation

of property. Relying on cases involving the enforceability of private covenants, they

argue that the consent covenant from the 1981 deed is "repugnant" to the County's fee

---

[14] A 1980 opinion from the Attorney General construed a similar statute: section 5-307 of the Education Article (which has since been renumbered as section 5-308). In brief, that statute provides that the State may not require reimbursement of debt service from a county for certain surplus schools transferred to a county that were constructed on or before February 1, 1971, and that the State shall require reimbursement for outstanding debt service for certain schools built or substantially renovated after that date. 65 Md. Op. Att'y Gen. at 214. The Attorney General observed that this statute "is, in effect, a narrowly drawn statute that is applicable only in limited circumstances and on limited conditions." *Id.* at 217. More specifically, the Attorney General concluded that the Board of Public Works' other "broad powers" to review and approve or disapprove of the disposition of surplus schools "were intended to remain unaffected." *Id.* at 218. Subsection 5-301(i) of the Education Article merits a similarly narrow reading.

simple ownership and that the covenant has become an "unreasonable" restraint against alienation. Their challenge to the regulation assumes that the covenant is invalid and concludes that a regulation must be unenforceable if it imposes an equivalent restraint. They argue that the Board of Public Works' statutory authorization to make regulations does not "permit retrospective regulatory abrogation of common law principles of free alienation to which the inhabitants of Maryland are entitled as a matter of state constitutional law."[15]

The State attacks each link in that chain of reasoning. The State argues that the common law would not preclude the enforceability of the deed covenant; that the common law concerning alienation of property does not apply to "an intergovernmental transfer between the State and one of its political subdivisions"; and that an agency with the authority to make regulations that have statutory force may create exceptions to the common law to the same extent as any statute passed by the legislature.

Although the briefs engage in a wide-ranging debate on these issues, it is unnecessary to discuss all of them. It is dispositive that the State's modification of a county's power to dispose of property is not subject to the same constitutional restraints that apply to the State's restriction of existing private property rights.

---

[15] In speaking of "abrogation" of the common law, Merritt Pavilion and the County do not use that word in its traditional sense. *See generally 100 Harborview Drive Condo. Council of Unit Owners v. Clark*, 224 Md. App. 13, 41-42 & n.6 (2015). In other words, they do not contend that the Board of Public Works' regulations remove or replace the entire common-law doctrine regarding free alienation of property. Instead, they use the term "abrogation" to describe what they see as the Board's creation of a narrow exception that overrides common-law principles that might otherwise control the transaction.

Merritt Pavilion and the County cite Article 5(a)(1) of the Maryland Declaration of Rights, which declares "[t]hat the *Inhabitants of Maryland* are entitled to the Common Law of England, . . . and to the benefit of such of the English statutes as existed on [July 4, 1776]; and which, by experience, have been found applicable to their local and other circumstances, and have been introduced, used and practiced by the Courts of Law or Equity; . . . subject, nevertheless, to the revision of, and amendment or repeal by, the Legislature of this State." (Emphasis added.) It is debatable whether Merritt Pavilion, a limited liability company with offices in Maryland, is or is not an "[i]nhabitant[] of Maryland[.]" But Merritt Pavilion does not own the property (at least not yet). Baltimore County owns it.

Baltimore County is a charter county organized under Article XI-A of the Maryland Constitution. *See, e.g.*, *Gunpowder Horse Stables, Inc. v. State Farm Auto. Ins. Co.*, 108 Md. App. 612, 618 (1996). The Maryland Constitution empowers the General Assembly to "provide a grant of express powers" to charter counties. Md. Const. Art. XI-A, § 2. Property rights of a charter county emanate from the Express Powers Act, which provides that "[a] charter county . . . may acquire and hold property, either absolutely or in trust for a public purpose" and "may dispose of property[.]" Md. Code (2013), § 9-201(3)-(4) of the Local Government Article. A county's power to dispose of property, as with its other expressly granted powers, "may be extended, modified, amended or repealed by the General Assembly." Md. Const. Art. XI-A, § 2; *see also* Dan Friedman, *The Maryland State Constitution* 315 (2d ed. 2011) (explaining that the General Assembly may "pass public general laws governing subjects that are within the

-39-

express powers of the local governments").

The General Assembly has modified each county's right to dispose of property in a number of ways that are relevant to the issues in this case. Property owned by the State or a unit of the State government may be transferred "to any county or municipal corporation in the State subject to any conditions the Board [of Public Works] imposes." Md. Code (1985, 2015 Repl. Vol.), § 10-305(a)(2) of the State Finance and Procurement Article. When a county board of education transfers surplus school property to a county, the county may not dispose of the property by gift. Md. Code (1978, 2014 Repl. Vol.), § 4-115 of the Education Article (providing that property determined to be surplus school property "shall be transferred by the county board to the county commissioners or county council and may be used, sold, leased, or otherwise disposed of, *except by gift*, by the county commissioners or county council" (emphasis added)). These statutory provisions govern an initial transfer of property to a county (like the one that occurred in 1981), but both statutes illustrate that the State may modify a county's power to dispose of property.

When the General Assembly authorized the Board of Public Works to adopt substantive regulations for the administration of the school construction program (*id.* § 5-301(d)(1)), the legislature expressly envisioned that the regulations might modify the powers of county governments. The statute provides: "With respect to public school construction or public school capital improvements, including sites for school buildings, the authority, responsibilities, *powers*, and duties of" the county governments "are subject to the regulations adopted by the Board of Public Works" under section 5-301 of the Education Article. *See id.* § 5-301(g)(1) (emphasis added). The Board's regulations and

procedures prevail "[i]f, as to public school construction or public school capital improvements, there is any conflict between the regulations and procedures of the Board of Public Works and the authority, responsibilities, *powers*, and duties of the individuals and agencies" subject to the Board's regulations. *Id.* § 5-301(g)(2) (emphasis added). These "powers" subject to the Board's control include a county's power to dispose of property under the Express Powers Act. Section 5-301 thus authorizes the Board of Public Works to limit a county's power to dispose of property, which the Board did when it enacted COMAR 23.03.02.24.

As one aspect of their arguments about abrogation of the common law, Merritt Pavilion and the County accuse the State of "retroactively" invoking its regulations. These references to retroactivity appear to invoke constitutional protections against statutes that impair substantive rights that have vested before the enactment of a statute. *See, e.g.*, *Muskin v. State Dep't of Assessments & Taxation*, 422 Md. 544, 555-58 (2011). As the State points out, however, "'there is a wide and substantial distinction'" between counties and private citizens "'with respect to vested rights protected from legislative power.'" *State v. Bd. of Educ. of Montgomery Cnty.*, 346 Md. 633, 645 (1997) (quoting *Mayor & City Council of Hagerstown v. Sehner*, 37 Md. 180, 192-93 (1872)). The rights of political subdivisions of the State "being granted for the purposes of government, can never become such vested rights as against the State that they cannot be taken away[.]" *Baltimore Cnty. v. Churchill*, 271 Md. 1, 9 (1974) (citation and quotation marks omitted). "'[T]he counties," like other public bodies, "'are instruments of government subject at all times to the control of the Legislature with respect to their duration, powers, rights and

-41-

property.'" *State v. Bd. of Educ. of Montgomery Cnty.*, 346 Md. at 645 (quoting *Hagerstown v. Sehner*, 37 Md. at 193).

COMAR 23.03.02.24, therefore, does not improperly abrogate common-law rights. The regulation properly modifies a county's *power* to dispose of property. The authorities cited by Merritt Pavilion and the County are inapposite because they do not involve modifications to a county's power to dispose of property.

### III.    Validity of the 1981 Deed Covenant

As discussed above, we have concluded that, even if the covenant did not exist, COMAR 23.03.02.24 would require the County to obtain approval from the Board of Public Works to dispose of this former school property. As a separate issue, the State contends that the court erred when it declared that the covenant was invalid; Merritt Pavilion and the County contend that the court was correct when it made that determination. For a few reasons, we decline to decide that issue and instead vacate the portions of the declaration that concern the 1981 deed covenant.

The covenant and the regulation achieve similar effects, but they are not identical. For instance, the deed speaks only of "consent" from the Board of Public Works, but the regulation specifies that the Board may "conditionally approve" a request and "may require that the disposition documents specifically incorporate the conditions." COMAR 23.03.02.24(D). The Board's regulations and procedures prevail in the event of any conflict with "the authority, responsibilities, powers, [or] duties" of the county government. Md. Code (1978, 2014 Repl. Vol.), § 5-301(g)(2) of the Education Article. Thus, the regulation reigns supreme over whatever responsibilities the County may have

-42-

had under the deed.

Because the terms of the regulation control and because the County would be subject to the regulation even if the covenant were invalid, it is unnecessary to analyze the validity of the covenant. Regardless of the status of the covenant, the Board of Public Works "may approve, disapprove or conditionally approve" the County's request under COMAR 23.03.02.24(D). It would serve no useful purpose to declare the parties' additional rights in the event of some controversy that may never arise. *See Hickory Point P'ship v. Anne Arundel Cnty.*, 316 Md. 118, 129-31 (1989) (holding that parties were entitled to a "limited declaration" on one issue raised in a declaratory judgment action but that the ripeness doctrine, which provides the court with "choice among the grounds for decision" and "an opportunity thus to decide in the narrowest compass," made it improper to decide other issues that might not arise (citations and quotation marks omitted)).

## CONCLUSION

The circuit court did not abuse its discretion in issuing a declaratory judgment even though a separate declaratory judgment action involving some common issues was pending. The court nevertheless erred, because the State of Maryland is entitled to judgment in its favor under the undisputed facts of this case.

As explained previously, our task in reviewing this declaration is not to determine whether the Board of Public Works has abused its approval power, but only to determine whether the Board can exercise that power at all. We have determined that under its regulations the Board can exercise that power.

-43-

The State is entitled to a declaration stating that the regulation codified at COMAR 23.03.02.24 applies to Baltimore County's request to dispose of the property that was formerly the site of North Point Junior High School. Baltimore County is subject to this regulation. To enforce this regulation, the State need not demonstrate that it has a direct financial interest as to the property or the transaction. The regulation requires Baltimore County to seek and obtain the approval of Board of Public Works before disposing of the former school property. Under COMAR 23.03.02.24(D), the Board of Public Works may approve, disapprove, or conditionally approve the request to dispose of the former school property. In addition, the Board may require that the disposition documents specifically incorporate the conditions that it imposes.

**MOTION TO STRIKE NON-PARTIES, KAREN CRUZ ET AL., AS APPELLEES GRANTED. MOTION TO STRIKE APPENDIX TO APPELLANT'S REPLY BRIEF DENIED. JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE DIVIDED BETWEEN APPELLEE BALTIMORE COUNTY AND APPELLEE MERRITT PAVILION, LLC.**